```
_____ FILED  _____ ENTERED
_____ LODGED_____ RECEIVED

        JUN 27 2002      KN
              AT SEATTLE
        CLERK U.S. DISTRICT COURT
   WESTERN DISTRICT OF WASHINGTON
   BY _____              DEPUTY
```

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PIVOTAL CORPORATION                     )
                                        )   CO2-1363L
                   Plaintiff,           )
                                        )   **COMPLAINT WITH JURY
        vs.                             )   DEMAND**
                                        )
INTERPATH COMMUNICATIONS, INC.          )
                                        )   
                   Defendant.           )
                                        )   CV 02-1363  #1
_____)

Plaintiff Pivotal Corporation ("Pivotal"), for its Complaint against Defendant Interpath

Communications, Inc. ("Interpath"), hereby states as follows:

<u>JURISDICTION, VENUE AND PARTIES</u>

1.      Pivotal is a corporation organized under the laws of the State of Washington with

its principal place of business in Kirkland, Washington.

2.      Interpath is a privately-held corporation which, upon information and belief, is

organized under the laws of a State other than the State of Washington, with its principal place of

business in Morrisville, North Carolina.

COMPLAINT -1-

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE (206) 903-8800
FAX: (206) 903-8820

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states, and the amount in controversy exceeds seventy-five thousand dollars and 00/100 ($75,000.00), exclusive of interest and costs.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein, including payments and notices to Plaintiff , occurred within this judicial district.  In addition, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Interpath is a resident of this judicial district.

## FACTUAL BACKGROUND

5.     Pivotal is a wholly-owned subsidiary of Pivotal Corporation, a company incorporated in British Columbia, Canada.  Pivotal and its parent company are leading providers of customer relationship management ("CRM") and electronic business solutions, software that allows their customers to automate and manage their marketing, selling and servicing processes.

6.     Interpath is a full-service Application Service Provider ("ASP"), delivering out-sourced application development, integration and hosting solutions to its customers.

7.     On or about June 29, 2001, Pivotal and Interpath entered into an agreement entitled the Pivotal Preferred ASP Partner Agreement (the "Agreement").  A true and correct copy of that Agreement is appended hereto as Exhibit A.

8.     Pursuant to the Agreement, Interpath was made Pivotal's Preferred ASP Partner in the United States and Australia service areas.  Pivotal agreed to refer to Interpath the customers using Pivotal software who wanted to use an ASP.  Interpath, in turn, agreed to provide installation, training, hosting, maintenance and other related ASP services to those customers.

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE (206) 903-8800
FAX (206) 903-8820

9.      Schedule A of the Agreement set forth certain fees that Interpath was obligated to pay to Pivotal, including a Preferred Partnership Fee of five million dollars ($5,000,000.00), payable in installments beginning on June 25, 2002, a Hosting Provider License Fee of two million dollars ($2,000,000.00), payable on or before June 30, 2001, and a Hosting Provider Maintenance Fee, payable in four quarterly installments during the first year of the Agreement, and payable thereafter annually, in advance.

10.     Schedule A of the Agreement also provided certain targets for various time periods regarding both the amount of revenues that Interpath would receive from customers using Pivotal software and also the number of Pivotal customers delivered to Interpath.

11.     Pivotal agreed in Paragraph 3.1 of Schedule A that if it failed to meet a minimum revenue target (the "Minimum Obligation") for a particular period, it would pay the difference between the revenues received by Interpath and that Minimum Obligation.

12.     Pivotal agreed in Paragraph 3.2 of Schedule A that if it did not meet the customer target established for the first year of the Agreement, Interpath had the right to terminate a portion of the Agreement and was not obligated to pay any remaining Preferred Partnership Fees. Paragraph 3.2 of Schedule A further provided that if Interpath chose to terminate that portion of the Agreement because the customer target was not met, Pivotal was not obligated to make any further Minimum Obligation payments to Interpath, other than the payment that would have been due the month following the month in which the termination occurred.

13.     In addition to the above terms and conditions regarding Interpath's right to terminate a portion of the Agreement, Paragraph 8.5 of the Agreement stated that Interpath had the right to terminate a portion of the Agreement upon ten days written notice if Pivotal failed to "meet the Revenue Targets" set forth in Schedule A, and that "upon such termination, the parties

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1   shall have the rights set forth on Schedule A."

2      14.     Paragraph 8.4 of the Agreement provided, in addition, that either party could

3   terminate the Agreement upon ten days written notice if the other party breached a material

4   provision of the Agreement and failed to cure that breach within thirty days written notice of the

5   breach by the non-breaching party. If Interpath terminated the Agreement pursuant to this

6   Paragraph, Pivotal was required to pay all remaining Minimum Obligation payments required to

7   be made over the remainder of the term of the Agreement, and Interpath was excused from

8   making any additional Preferred Partnership Fee payments.

9

10     15.     Pivotal has been unable to meet the monthly revenue targets set forth in Paragraph

11  3.1, and thus has made Minimum Obligation payments to Interpath.

12     16.     Interpath failed to make its Hosting Provider Maintenance Fee quarterly payment

13  of seventy-five thousand dollars ($75,000.00) due on or about April 1, 2002.  Accordingly,

14  Pivotal has not paid the Minimum Obligations that would have otherwise been due after that

15  date.

16     17.     Upon information and belief, Bain Corporation or an affiliate of Bain Corporation

17  ("Bain"), a private equity firm, owns a controlling interest in Interpath.  On May 22, 2002, Bain

18  announced an agreement merging Interpath with another ASP, called USinternetworking, Inc.

19  ("USi"), a company in which Bain also owns a controlling interest.  Upon information and belief,

20  this merger has not yet been completed.

21

22     18.     On or about June 13, 2002, Interpath's Executive Vice President and CFO, Mr.

23  Louis Salamone Sr., sent a letter on behalf of Interpath to Pivotal's General Counsel.  A true and

24  correct copy of that letter is appended hereto as Exhibit B.  In that letter, Interpath purported to

25  give notice that Interpath was terminating the Agreement effective June 23, 2002, under section

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

8.5 of the Agreement due to Pivotal's alleged failure to meet the "Revenue Targets" of Schedule A. Interpath also alleged that Pivotal was in material breach of the Agreement, demanded that Pivotal return fees that Interpath had paid to Pivotal, and further demanded that Pivotal pay Interpath all remaining Minimum Obligation payments. The letter concludes by stating that if Pivotal does not pay these amounts to Interpath on or before July 23, 2002, Interpath "shall pursue its legal remedies."

19. Pivotal is informed and believes, and thereupon alleges, that Interpath's June 13 letter and the positions that Interpath has taken therein are not motivated by any actions or omissions of Pivotal, but are rather motivated by Interpath's desire to abandon its relationship with Pivotal and instead form a relationship with Pivotal's competitors.

20. The company with whom Interpath is merging, USi, does not have a relationship with Pivotal, but does have relationships with other CRM software providers. Pivotal is informed and believes, and thereupon alleges, that as a result of the merger, Interpath has chosen to forge relationships with these other CRM software providers, all of whom are competitors of Pivotal. Pivotal, in fact, has recently learned that in recent sales calls made by Interpath personnel, Interpath salespersons have attempted to sell Siebel CRM software (a Pivotal competitor), not Pivotal software, to prospective and current Pivotal customers.

21. Interpath has failed to pay to Pivotal the Preferred Partnership Fee payment in the amount of $500,000 that was due to be paid to Pivotal on or before June 25, 2002 pursuant to paragraph 4.2 of Schedule A of the Agreement.

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE (206) 903-8800
FAX (206) 903-8820

1

## COUNT I

2

### Declaratory Judgment

3      22.     Pivotal realleges and incorporates herein by reference the allegations of

4    Paragraphs 1 through 21 of this Complaint.

5      23.     Interpath has no contractual right to terminate the Agreement or any portion

6    thereof due to Pivotal's failure to meet the minimum customer targets set forth in Paragraph 3.2

7    of Schedule A until at least a year after the Agreement's effective date. The Agreement's

8
9    effective date was June 29, 2001. Thus, Interpath's attempt to terminate the Agreement is of no

10   force or effect.

11     24.     Interpath has no contractual right to forego the payment to Interpath of any

12   portion of the Preferred Partnership Fee or the Hosting Provider Maintenance Fee.

13     25.     Interpath has no contractual right to terminate the Agreement or any portion

14   thereof under Paragraph 8.4 of the Agreement. Pivotal has not breached the Agreement.

15   Moreover, even if Pivotal had breached the Agreement, Interpath has not given Pivotal thirty

16   days in which to cure any such alleged breach.

17     26.     Interpath has no contractual right to demand that Pivotal pay Interpath the

18   Minimum Obligation payments specified for the remainder of the term of the Agreement.

19
20     27.     Interpath has no contractual right under Section 8.4 or Section 8.5 of the

21   Agreement to the return of either the Hosting Provider License Fee or any Hosting Provider

22   Maintenance Fees.

23     28.     Interpath has breached the Agreement as set forth in the Second Cause of Action,

24   below.

25     29.     As a result of the above-referenced actions of Interpath, Pivotal is excused and

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1  otherwise relieved from all further obligations under the Agreement.

2      30.    There is a substantial controversy between Pivotal and Interpath regarding the

3  matters set forth above.

4      31.    Pivotal is thus entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 as

5  to the matters set forth herein.

6  **COUNT II**

7  **Breach of Contract**

8      32.    Pivotal realleges and incorporates herein by reference the allegations of

9  Paragraphs 1 through 31 of this Complaint.

10      33.    Interpath is in breach of the Agreement, and its conduct amounts to an

11  anticipatory repudiation of the Agreement, in numerous respects, including the following:

12          a)    Interpath failed to make its Hosting Provider Maintenance Fee

13  quarterly payment of seventy-five thousand dollars ($75,000.00) due on or about April 1, 2002;

14          b)    Interpath has purported to terminate the Agreement, even though it

15  has no right to do so;

16          c)    Interpath has falsely alleged that Pivotal has breached the

17  Agreement;

18          d)    Interpath has demanded, without any basis or justification, that

19  Pivotal return certain fees paid by Interpath and that Pivotal pay all remaining Minimum

20  Obligations;

21          e)    Interpath has threatened Pivotal with litigation if Pivotal does not

22  do as Interpath demands;

23          f)    Interpath has not promoted Pivotal's CRM software to current and

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

prospective customers, and instead has promoted CRM software provided by Pivotal's competitors. Paragraph 2.1(b) and Paragraph 3.1 require Interpath to use reasonable efforts to promote appropriate Pivotal software to prospective customers, and to use commercially reasonable efforts to achieve the revenue targets set forth in Schedule A; and

g)   Interpath has failed to pay to Pivotal the Preferred Partnership Fee payment in the amount of $500,000 that was due to be paid to Pivotal on or before June 25, 2002 pursuant to paragraph 4.2 of Schedule A of the Agreement.

34.   Pivotal has fully performed any and all duties imposed on it by the Agreement, and has not engaged in any conduct or actions that would excuse performance by Interpath.

35.   Pivotal has suffered, and continues to suffer, substantial damages as a result of Interpath's breach of contract. The amount of these damages exceeds $75,000.00, exclusive of interests and costs.

WHEREFORE, Pivotal prays for judgment against defendant Interpath as follows:

1.   For general damages according to proof;

2.   For special damages according to proof;

3.   For a declaratory judgment that:

a)   Interpath has no contractual right to terminate the Agreement;

b)   Interpath has no contractual right to forego the payment to Pivotal of any portion of the Preferred Partnership Fee or the Hosting Provider Maintenance Fee;

c)   Interpath has no contractual right to demand that Pivotal pay Interpath the Minimum Obligation payments specified for the remainder of the term of the Agreement;

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

d)    Interpath has no contractual right under Section 8.4 or Section 8.5 of the Agreement to the return of either the Hosting Provider License Fee or any Hosting Provider Maintenance Fees;

e)    Interpath has breached the Agreement; and

f)    Pivotal is excused and otherwise relieved from all further obligations under the Agreement.

4.    For cost of the suit; and

5.    For such other and further relief as the court deems proper, including pre and post judgment interest and plaintiff's attorneys fees.

DATED this 27th day of June, 2002.

DORSEY & WHITNEY LLP

TODD S. FAIRCHILD WSBA #17654
1420 Fifth Avenue, #3400
Seattle, WA 98101

PETER W. SIPKINS
PAUL R. DIESETH
50 South Sixth St., #1500
Minneapolis, MN 55402-1498
(612) 340-2600

Attorneys for Plaintiff
PIVOTAL CORPORATION

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE (206) 903-8800
FAX (206) 903-8820

1

2

**JURY DEMAND**

3

Plaintiff demands a trial by jury of all issues properly triable.

4

DORSEY & WHITNEY LLP

5

6

7

TODD S. FAIRCHILD WSBA #17654

8

1420 Fifth Avenue, #3400
Seattle, WA 98101

9

10

PETER W. SIPKINS
PAUL R. DIESETH

11

50 South Sixth St., #1500
Minneapolis, MN 55402-1498

12

(612) 340-2600

13

Attorneys for Plaintiff
PIVOTAL CORPORATION

14

15

16

17

18

19

20

21

22

23

24

25

COMPLAINT WITH JURY DEMAND -10-

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

## PIVOTAL PREFERRED ASP PARTNER AGREEMENT



EFFECTIVE the 29th day of June 2001 (the **"Effective Date"**).

THE PARTIES:

| PIVOTAL CORPORATION<br><br>("Pivotal") | 10210 N.E. Points Drive<br>Kirkland, WA 98033 | Tel: 604-988-9982<br>Fax: 604-904-5854<br>www.pivotal.com |
|---|---|---|
| Primary Contact: | General Counsel<br>(604) 904-5335 | abgaulieu@pivotal.com |

AND:

| Interpath Communications, Inc.<br>("Preferred ASP Partner") | 1700 Perimeter Park Drive<br>Morrisville, NC  27560 | Tel: (919) 253-6000<br>Fax: (919) 253-6565<br>www.interpath.net |
|---|---|---|
| Primary Contact: | Graham Perry<br>(919) 253-6006 | |

BACKGROUND:

1. Pivotal develops, distributes and owns the Products and desires to promote such Products in various geographic territories through a network of Application Solution Providers ("ASP").

2. Preferred ASP Partner provides marketing, account management, application hosting, and technical consulting expertise and services that are complementary to the Products.

3. Pivotal desires to make Preferred ASP Partner, and Preferred ASP Partner desires to be, Pivotal's preferred application service provider in the Service Area, and Pivotal and Preferred ASP Partner desire to form a business alliance to promote the licensing and use of the Products in the Service Area, all upon the terms and conditions described below.

IN CONSIDERATION of the foregoing, the mutual covenants herein and other good and valuable consideration (the receipt and adequacy of which are hereby acknowledged) the parties agree as follows:

Parts of this Agreement:

| Terms and Conditions |
|---|
| Schedule A  Products, Territory, Revenue Targets and Fees |
| Schedule B  Discounts and Commissions |
| Schedule C  Certification and Training |
| Schedule D  RESERVED |
| Schedule E  Sample Service Level Agreement |
| Schedule F  License Registration to Master Escrow<br>Agreement |
| Schedule G  Pivotal Software Technical Support |



EXHIBIT *A*

## TERMS AND CONDITIONS

### 1. Interpretation and Definitions

1.1 Definitions. Capitalized expressions shall have the meanings ascribed below or in the applicable Schedules attached hereto:

(a) "Agreement" means this Agreement and all referenced or attached amendments, instruments and Schedules.

(b) "Preferred ASP Partner Trademarks" means any current or future Preferred ASP Partner names, trade or service marks, logos, designs, trade dress and other designations or brands for the Services, whether registered or not.

(c) "Business Module" means a configuration module for the Products that defines the structure of the End User's enterprise database and addresses the requirements of a particular business activity or a specified type of business. Certain Pivotal-created Business Modules are available under this Agreement, while other Business Modules may be available from a third party, duly licensed by Pivotal.

(d) "Certified Preferred ASP Partner" means a Preferred ASP Partner who has met the requirements in Schedule C to become certified by Pivotal.

(e) "Cover Section" means that portion of this Agreement beginning with the Effective Date and ending with the signatures of the parties following Section 10.12.

(f) "Customer Agreement" means Preferred ASP Partner's agreement with an End User for access to and use of the Products. the terms of which shall be no less protective of Pivotal's intellectual property, proprietary and other rights than the provisions contained within the License Agreement.

(g) "Documentation" means all user manuals, Product specifications and other documentation relating to the Products.

(h) "End User" means a person who uses the Products in the regular course of such person's business (including Preferred ASP Partner when and to the extent Preferred ASP Partner uses the Products directly in its own business).

(i) "End User Implementation Fee" means the charges payable by an End User for implementation services by Preferred ASP Partner or by Pivotal, as the case may be.

(j) "End User License Fee" means the charges payable by an End User (excluding Hosted Users) to Preferred ASP Partner for such End User's use of the Products.

(k) "End User Maintenance Fee" means the charges payable by an End User to Preferred ASP Partner for such End User's access to First Level Maintenance.

(l) "Enhancement" means modifications, additions or enhancements which alter or upgrade the functionality of a Product.

(m) "First Level Maintenance" means Preferred ASP Partner's primary and direct support for the Products to an End User under Preferred ASP Partner's own support and maintenance arrangement for such customer. As it relates to the Products. First Level Maintenance shall consist solely of Preferred ASP Partner's direct response to End User inquiries concerning the performance and operation of the Products.

(n) "Hosted User" means an End User who purchases the Products directly from Pivotal and accesses the Products through Preferred ASP Partner.

(o) "Hosting Provider License Fee" means the charges payable by Preferred ASP Partner to Pivotal for Preferred ASP Partner's right to furnish a Product to any Hosted User, as set out in Schedule A.

(p) "Hosting Provider Maintenance Fee" means the charges payable by Preferred ASP Partner to Pivotal for Second Level Maintenance and for the right to furnish any First Level Maintenance to any Hosted User, as set out in Schedule A.

(q) "Legal Action" means any third party suit, claim or other legal action.

(r) "License" has the meaning set forth in Section 2.2 below.

(s) "Maintenance" means, collectively, First Level Maintenance and Second Level Maintenance.

(t) **"Pivotal Trademarks"** means any current or future Pivotal names, trade or service marks, logos, designs, trade dress and other designations or brands for the Products, whether registered or not.

(u) **"Preferred Partnership Fee"** means the charges payable by Preferred ASP Partner to Pivotal for Preferred ASP Partner's right to furnish Products to any End User, as set out in Schedule A.

(v) **"Preferred Partnership Portion of this Agreement"** means the provisions of this Agreement that relate to the designation of the Preferred ASP Partner as Pivotal's primary application service provider pursuant to Section 2.1, and the corresponding obligations of Pivotal pursuant to Section 3 of Schedule A and the Preferred ASP Provider's obligation to pay the Preferred Partnership Fee.

(w) **"Preferred Partnership Term"** has the meaning set forth in Section 8.1 below.

(x) **"Products"** means Pivotal eRelationship 2000® customer interaction software products listed on Schedule A, as such schedule may be amended from time to time by mutual agreement.

(y) **"Program Fee"** means the charges previously paid by Preferred ASP Partner to Pivotal for the initial sales and technical training of Preferred ASP Partner's staff, as set out in Schedule A.

(z) **"Renewal Preferred Partnership Term"** has the meaning set forth in Section 8.2 below.

(aa) **"Representative"** means the designated employee responsible for an End User's account on behalf of Pivotal and Preferred ASP Partner, respectively.

(bb) **"Second Level Maintenance"** means Pivotal's indirect support for the Products provided to Preferred ASP Partner to resolve questions addressed to Preferred ASP Partner from End Users.

(cc) **"Servers"** means the hardware and software system owned or licensed by Preferred ASP Partner on which the Products are installed by Preferred ASP Partner to permit access and use by End Users.

(dd) **"Services"** means all services provided by Preferred ASP Partner under this

Agreement, including, without limitation, hosting of the Products on its Servers.

(ee) **"Service Area"** means the geographic area listed on Schedule A.

(ff) **"Sublicense Fee"** means the monthly charges payable by Preferred ASP Partner to Pivotal for each End User's (excluding Hosted Users) use of the Products.

## 2. Grant of Rights

2.1 Appointment; Preferred ASP Partner's Duties. Subject to the terms and conditions herein, Pivotal hereby appoints Preferred ASP Partner and Preferred ASP Partner hereby accepts such appointment as an independent, non-exclusive Certified Preferred ASP Partner of the Products within the Service Area. While the parties acknowledge that Preferred ASP Partner is not Pivotal's exclusive application service provider in the Service Area, during the Preferred Partnership Term or any Renewal Preferred Partnership Term, it is the parties intention that Preferred ASP Partner will be the primary application service provider for Pivotal in the Service Area (other than with respect to credit unions), and Pivotal agrees to (a) refer all Customers (as defined in Section 3.2 of Schedule A) that desire to use an application service provider to the Preferred ASP Partner, and (b) not enter into a similar arrangement with any other application service provider in the Service Area during the Preferred Partnership Term or any Renewal Preferred Partnership Term. In addition to the duties and responsibilities set forth in Sections 3 and 4 below, at its own expense, Pivotal shall use reasonable efforts to (a) meet the revenue and customer targets set forth on Schedule A hereto; (b) assist Preferred ASP Partner in entering into a strategic relationship with Microsoft by introducing Preferred ASP Partner to Pivotal's executive-level contacts at Microsoft and by promoting Preferred ASP Partner within Microsoft; and (c) assist Preferred ASP Partner in developing Strategic relationships with Pivotal's current and future system integration partners. At its own expense, Preferred ASP Partner shall use reasonable efforts to:

(a) assist Pivotal in developing Strategic relationships with Preferred ASP Partner's system integration partners

(b) identify and promote the appropriate Products and Services for each End User or prospective End User;

(c) through its system integration partners, develop customized Business Modules for End Users;

(d) provide installation and other special services to End Users for the Products;

(e) host the Products on the Servers and provide access thereto and use thereof by End Users, if they so desire:

(f) train End Users in the use and application of the Products;

(g) provide First Level Maintenance to End Users;

(h) verify the successful operation of the Products following installation on the Servers;

(i) negotiate a service level agreement with each customer that will provide such customers with service levels similar to the ones contained in the sample Service Level Agreement attached hereto as Schedule E;

(j) report promptly to Pivotal all suspected and actual material errors, bugs or other problems with the Products; and

(k) promptly respond to all reasonable requests of Pivotal for written reports on trademark use or suspected infringement, customer satisfaction and other market conditions, and cooperate with Pivotal in contacting such third-parties and customers for follow-up surveys, references and case studies.

2.2 Grant of License. Subject to the terms and conditions of this Agreement, in consideration of payment of the Hosting Provider License Fee set forth in Schedule A, Pivotal hereby grants to Preferred ASP Partner, and Preferred ASP Partner hereby accepts, a perpetual, non-transferable and non-exclusive master license (the "License") to (a) install the Products on its own server, (b) market and provide the Products to End Users and prospective End Users in the Service Area on an Application Service Provider ("ASP") basis as hosted through the Servers, and (c) sublicense the

Products on the terms and conditions contained herein.

2.3 Limitation and Non-Exclusivity. Subject to the provisions of Section 2.1 above, Preferred ASP Partner's appointment herein is non-exclusive within the Service Area, and specifically excludes credit unions.

2.4 Good Faith. The parties shall work together in good faith to promote the Products and Services and to protect each other's good name and reputation and to be fair and accurate in all representations about the other party and its products and services.

2.5 Prohibitions. Preferred ASP Partner shall not, and shall not permit others to, directly or indirectly,

(a) Subject to Section 10.3, subcontract to any dealers, agents, representatives or subcontractors the right to provide the Services except with Pivotal's prior written consent, which consent shall not to be unreasonably withheld or delayed assuming such subcontractor can provide the Services at the same level of quality as a certified Preferred ASP Partner (which determination shall be made by Pivotal in its good faith); provided, however, that nothing herein shall prevent the Preferred ASP Partner from entering into agreements with its system integration partners to develop customized business modules for use with the Products;

(b) misuse, decompile, disassemble, or reverse engineer the Products;

(c) except as is otherwise described within this Agreement, copy, install or use the Products, whether for evaluation or otherwise;

(d) make any material change to Pivotal's standard license conditions for the Products, the Alliance Manual or any other standard Pivotal policies without the prior written consent of Pivotal; or

(e) provide any uncertified training courses to End Users for the Products.

2.6 Internal Use. Preferred ASP Partner has installed and implemented the Products for the conduct of its own information technology business and shall endeavor to apply the Products to its customer relationships with End Users.

2.7 <u>Demonstration Use</u>. Preferred ASP Partner may permit employees and authorized persons acting on behalf of Preferred ASP Partner to access the functionality of the Products in order to demonstrate Preferred ASP Partner's Services to prospective End Users. Preferred ASP Partner must keep accurate records of every such demonstration, including the name of the prospective End User and the number of User Ids provided for such demonstration, and the Products must remain at all times in the possession and under the direct control of Preferred ASP Partner. Access to the Products in this Section 2.7 is contingent upon the employees and authorized personnel accessing the functionality of the Products being bound by standard confidentiality and nondisclosure agreements that protect any confidential information of Pivotal contained in the Products. Preferred ASP Partner shall provide Pivotal with a copy of such records upon request.

2.8 <u>Testing and Evaluation Copies</u>. Preferred ASP Partner may install and use a reasonable number of copies of the Products solely within its own data center(s) for the purpose of testing and evaluation of the Products, subject to the limitation set forth herein. The Products may be connected at any point in time to a reasonable number of workstations or computers operating on one or more of Preferred ASP Partner's own internal networks. For Products commercially released on or before the Effective Date of this Agreement, Preferred ASP Partner's right to test and evaluate such Products shall begin on the Effective Date and shall end ninety (90) days after such Effective Date. For Products commercially released by Pivotal after the Effective Date of this Agreement, Preferred ASP Partner's right to test and evaluate such Products shall begin on the release date of such Products and shall end ninety (90) days after such release.

2.9 <u>Source Code Escrow Agreement</u>. Upon execution of this Agreement, Pivotal shall provide to the Preferred ASP Partner an executed copy of the Source Code Escrow Agreement attached hereto as Exhibit F, and shall, concurrent therewith, deposit into

escrow the deposits required thereunder. The Source Code Escrow Agreement shall be deemed to be an agreement supplementary to this Agreement for purposes of 11 U.S.C. Section 365(n)(1)(B). Pivotal shall be responsible for the costs associated with such Source Code Escrow Agreement. Pivotal shall be required to update the Source Code and Source Code Documentation in accordance with the terms of the Source Code Escrow Agreement. In the event Pivotal fails to place the deposits in escrow within thirty (30) calendar days of the effective date of the attached Escrow Agreement, the Preferred ASP Partner may, in its sole discretion, terminate this Agreement in accordance with Section 8.4 of this Agreement and/or seek equitable remedies including, without limitation, specific performance against Pivotal to compel Pivotal to make the required escrow deposits.

2.10 <u>Delivery of the Products</u>. After the Effective Date of this Agreement, Pivotal shall, as soon as commercially practical, provide Preferred ASP Partner with (a) the most recent "instance up" version of the Product for Preferred ASP Partner to use to develop its Product offering timeline, and (b) a reasonable number of copies of any available demonstration versions of the Product such that Preferred ASP Partner may immediately begin marketing activities as envisioned by this Agreement.

**3. Annual Business Plan, Marketing, Sales, Sublicensing and Alliance Management**

3.1 <u>Annual Business Plan, Quarterly Sales and Marketing Plans</u>. Within (30) days of the Effective Date, the dedicated relationship managers designated by Pivotal and Preferred ASP Partner shall jointly develop a written business plan for the Pivotal/Preferred ASP Partner alliance. During the Preferred Partnership Term and any Renewal Preferred Partnership Term of this Agreement, Pivotal and Preferred ASP Partner shall jointly revise such business plan at least annually, and shall hold quarterly status meetings to update the executives of Pivotal and Preferred ASP Partner on the status of the business relationship between the parties. Pivotal and

(Continued)

Preferred ASP Partner shall also jointly develop a quarterly sales and marketing plan at least thirty (30) days prior to the commencement of each calendar quarter during the Preferred Partnership Term and any Renewal Preferred Partnership Term of this Agreement, setting forth the specific targeted End User prospects, sales and marketing activities and revenue targets for such quarter. The parties shall then use their respective commercially reasonable efforts to achieve the revenue targets and overall strategic partnership parameters as set out in Schedule A.

3.2 Co-marketing. Pivotal and Preferred ASP Partner herein agree to jointly accomplish:

    (a) quarterly coordination meetings for participation in marketing events and trade shows, development of confidential lists of Sales Opportunities, exchange of confidential pre-release product development information, and planning for joint sales training for both Pivotal and Preferred ASP Partner sales staffs;

    (b) product references and endorsements, including demonstrations of installed Products to prospective End Users;

    (c) introductions and recommendations for Pivotal, Preferred ASP Partner and the Products to prospective End Users;

    (d) responses in a timely manner to referrals, when either party refers a prospective End User to the other party;

    (e) mutually agreeable joint marketing and promotion of the ultimate goals herein. The amount that each party shall contribute during the Preferred Partnership Term or any Renewal Preferred Partnership Term of this Agreement is subject to good faith negotiations between the parties;

    (f) the parties shall create a joint press release announcing the Pivotal and Preferred ASP Partner relationship, and may jointly develop a roadshow presentation, and may hold face to face meetings with all of both party's sales representatives; and

    (g) a marketing and sales program, jointly designed, to allow each of the parties to co-engage in sales opportunities with the sales organization of the other, that is

modeled on the Pivotal relationship with Microsoft.

    (h).

3.3 Costs and Acknowledgment. Each party shall bear its own costs hereunder and may not bring a claim for any such costs against the other party. The parties acknowledge that neither has received any warranty or guarantee, express or implied, as to the potential sales volume, profits or success of the business venture contemplated herein; provided, however, that nothing shall limit Preferred ASP Partner's rights to terminate the Preferred Partnership Portion of this Agreement in accordance with Schedule A in the event Pivotal fails to meet its revenue or customer obligations set forth therein.

3.4 Marketing Reports. Both Preferred ASP Partner and Pivotal shall keep each other reasonably apprised of its respective marketing efforts, including written reports to the other's Representative as frequently and in such form as reasonably requested by such representative from time to time.

3.5 Referrals. Preferred ASP Partner shall refer to Pivotal all license inquiries received by the Preferred ASP Partner from any customer outside the Service Area. If such customer executes and delivers a license or sublicense (or otherwise agrees to be bound to a license or sublicense) for the Products within 105 days of the Preferred ASP Partner's referral. Pivotal shall provide Preferred ASP Partner a commission fee, to be determined on a case-by-case basis, but in no case less than 10% of the amount received by Pivotal from the customer. Pivotal shall also reimburse Preferred ASP Partner its reasonable out-of-pocket expenses incurred in providing such successful referral. In addition, in the event Preferred ASP Partner refers customers to Pivotal inside the Service Area, Pivotal shall provide to Preferred ASP Provider a commission fee as set forth in Schedule B hereto.

3.6 End User Sublicenses. Preferred ASP Partner shall ensure that each End User is bound by the terms of a license agreement providing Pivotal with at least the same level of protection for the Product as contained in this Agreement prior to

allowing such End User access to the Products.

3.7 Reservation of Rights. Pivotal reserves the right, in its sole discretion and from time to time:

(a) increase or decrease its marketing and sales channels;

(b) discontinue or modify the development, publication, licensing, and/or support and maintenance of any Products; and

(c) modify its Products and services, policies or packaging at any time. In the event that any change described in clauses (a), (b) or (c) occurs and materially and adversely alters the economic benefit of this Agreement to be received by Preferred ASP Partner, Preferred ASP Partner shall have the right to terminate this Agreement, and receive a pro rata refund of all amounts paid pursuant to this Agreement (based on the number of months remaining in the Preferred Partnership Term or any Renewal Preferred Partnership Term).

3.8 Special Services. Preferred ASP Partner shall use commercially reasonable efforts to accommodate requests for customization of the Products or other special services from End Users in a timely fashion, all at prices to be established by the Preferred ASP Partner in its sole discretion. If an End User requests any special services from Pivotal, Pivotal shall use commercially reasonable efforts to accommodate such requests and shall provide its estimate of the costs for such services to the Preferred ASP Partner or End User, as appropriate.

3.9 Pricing. Preferred ASP Partner may set its own prices and fees for the Products and Services.

3.10 Customer    Account    Administration. Preferred ASP Partner shall be solely responsible for all End User direct contact and account administration, including any End User invoicing and collection, unless otherwise agreed by Pivotal in advance.

3.11 Upgrades and Enhancements. Preferred ASP Partner shall use commercially reasonable efforts to install upgrades or new versions of the Products on its Servers for access by End Users in the Service Area.

3.12 Training Services. Preferred ASP Partner shall make available to End Users its own end-user training classes related to the Products and to any Products that have been customized by Preferred ASP Partner, all at prices to be established by the Preferred ASP Partner in its sole discretion. Pivotal shall provide any other training directly or through a Pivotal Certified Education Center. Preferred ASP Partner shall conduct Product training classes only through Preferred ASP Partner staff who are certified Pivotal Product instructors.

3.13 Trademark and Copyright Notices.

(a) Preferred ASP Partner shall only use and display the Pivotal Trademarks or Pivotal Literature in accordance with the Alliance Manual. Preferred ASP Partner shall ensure that proper trademark and copyright notices are displayed at all times in such usage, including any such use or display on Preferred ASP Partner's Web site. In any event, Preferred ASP Partner acknowledges that it obtains no rights or interest (other than the limited license granted for purposes of this Agreement) in any Pivotal Trademark or in the goodwill accruing there from.

(b) Pivotal shall only use and display the Preferred ASP Partner Trademarks in a manner which receives the express written approval of Preferred ASP Partner. Pivotal shall ensure that proper trademark and copyright notices are displayed at all times in such usage, including any such use or display on Pivotal's Web site. In any event, Pivotal acknowledges that it obtains no rights or interest in any Preferred ASP Partner Trademark or in the goodwill accruing there from.

3.14 Preferred ASP Partner Personnel. Preferred ASP Partner shall market, distribute, install, implement, host and support the Products only with trained representatives who have had approved technical training from Pivotal, as set out in Schedule C. Such training shall take place at such location as is agreed upon by the parties. Preferred ASP Partner previously has paid the Preferred ASP Partner Program Fee, as

outlined in Schedule A, for such technical training and shall bear all of the travel and out-of-pocket expenses for such representatives. Pivotal agrees to give the Preferred ASP Partner full credit for all existing training credits in existence as of the date hereof. All training provided by either party for which fees are to be charged shall be provided at a rate equal to 50% of such party's standard rates for training.

3.15 Alliance Management. Pivotal and Preferred ASP Partner shall assign the following dedicated contacts to help ensure a successful Alliance relationship:

    (a) Account Manager to act as the primary contact for all business communications and issues that may need to be addressed from either party.

    (b) Sales Liaison to act as the primary contact and coordinator for any Sales Opportunity,

    (c) Marketing Lead to act as the primary contact and coordinator for activities described in Section 3.2 hereof, and

    (d) Research and Development Lead to act as the primary contact and coordinator for maintenance and technical matters.

## 4. Pivotal Rights and Obligations

4.1 Pivotal Materials. Pivotal shall provide the following materials and services to Preferred ASP Partner:

    (a) a copy of Rapid Productivity Methodology (RPM);

    (b) demonstration copies of available Business Modules for Product demonstrations;

    (c) available marketing and sales materials in electronic format, including literature, demonstration CDs, and PowerPoint presentations; and

    (d) regulated access to Pivotal's restricted Internet website.

4.2 Training. Pivotal shall provide user, administration and technical training as set out in Schedule C to a designated number of Preferred ASP Partner's employees at a designated Pivotal training facility. Preferred ASP Partner shall bear all its own

expenses incurred by Preferred ASP Partner's employees for such training. including their wages and other employment benefits, transportation, accommodations, meals and other living expenses.

4.3 Additional Services to End Users. Pivotal shall use commercially reasonable efforts to provide the following services directly to End Users on request, subject to resource availability:

    (a) software consulting services on End User system requirements for commercially available Products, implementation services, and Business Module configuration services; and

    (b) technical, user and system administration training for the Products.

4.4 Sales Literature. Pivotal shall provide copies of Pivotal's current advertising and marketing materials to Preferred ASP Partner, upon request, for use in marketing the Products at no charge. Pivotal hereby grants, and Preferred ASP Partner hereby accepts, a royalty-free, non-exclusive, non-transferable, worldwide license to use, reproduce and distribute such materials in their original form solely for the purposes and term hereof. Preferred ASP Partner shall not make any derivative works from such materials without Pivotal's prior written consent.

4.5 Maintenance. With respect to End Users, Preferred ASP Partner shall be solely responsible for First Level Maintenance and for establishment of an adequate technical support team to deliver First Level Maintenance to such End Users. Pivotal shall have no direct support obligation of any kind or degree to any End User, and Pivotal shall supply any Second Level Maintenance solely to Preferred ASP Partner as outlined in Section 9. If Preferred ASP Partner is unable to fulfill its First Level Maintenance obligations to End Users, it shall immediately notify Pivotal and Pivotal may then, at its option, provide First Level Maintenance to End Users, and charge Preferred ASP Partner for the reasonable cost of any maintenance so provided at rates generally charged to Pivotal's direct customers. Pivotal shall provide Second Level Maintenance to

Preferred ASP Partner only if the Products are installed in a hardware and software environment that Pivotal then currently supports. Within Second Level Maintenance, Pivotal shall use its best efforts to provide analysis, problem investigation and correction, patches or work-arounds of error in the Products without unreasonable delay. However, Pivotal does not warrant that it can or will fix every error reported by Preferred ASP Partner or its End Users.

4.6 Updated Versions. Assuming Preferred ASP Partner has paid the Provider Maintenance Fee to Pivotal for the current period, Pivotal shall deliver to Preferred ASP Partner, at no charge, master copies of any updated version of the Products. Such updated versions shall include upgrades, modifications, additions, Enhancements, and new releases, and shall be delivered promptly upon their commercial availability, substantially in the same form as Preferred ASP Partner received the prior version. Pivotal shall also deliver to Preferred ASP Partner any other materials necessary for Preferred ASP Partner to incorporate such updates in existing Products or to supersede prior versions. Preferred ASP Partner shall then be responsible for further distribution of such updated versions and materials to End Users within its First Level Maintenance obligations.

4.7 Joint Software Development. Pivotal shall consider a request made by Preferred ASP Partner to engage in joint software development for the purpose of improving ability of Products to run hosted on Preferred ASP Partner Servers. Any joint software development projects will be governed outside the terms of this Agreement through a separate engagement Agreement.

4.8 Relationship Manager. Pivotal shall provide a dedicated relationship manager responsible for developing joint sales, marketing and technology development activities. The relationship manager will initiate the overall joint business plan, and coordinate quarterly status meetings.

4.9 Research and Development. Pivotal shall designate the Research and Development Lead to provide a direct interface into Pivotal's research and development department to allow for joint development activities.

## 5. Preferred ASP Partner Fees, and Discounts

5.1 Provider License Fees, Preferred Partnership Fees, Hosting Provider Maintenance Fees and Program Fee. Preferred ASP Partner shall pay to Pivotal the following fees as outlined in Schedule A: (a) a one-time Hosting Provider License Fee and an initial annual Hosting Provider Maintenance Fee; (b) the Preferred Partnership Fee, payable in accordance with Schedule A hereto; (c) a one-time Program Fee (previously paid); and (d) a monthly Sublicense Fee for each End User (excluding Hosted Users) accessing the Products. Except as set forth on Schedule A hereto with respect to the Preferred Partnership Fee, Preferred ASP Partner shall owe such fees to Pivotal only if it collects the End User License Fee or End User Maintenance Fee. In the event that a sale by Preferred ASP Partner to an End User originates from a Pivotal direct sales representative, Interpath will issue a notice to Pivotal at the time the End User agreement is executed solely for the purpose of facilitating Pivotal's internal tracking of commissions.

5.2 Reports. Within fifteen (15) days after the end of each month during the Preferred Partnership Term or any Renewal Preferred Partnership Term hereof, Preferred ASP Partner shall deliver to Pivotal a report that states: (a) the number of total End Users and Hosted Users accessing the Products during the immediately preceding month, (b) the total number of new End Users and Hosted Users accessing the Products in the previous calendar month, and (c) the Pivotal products under sublicense to each End User. Commencing after September 30, 2001, within fifteen (15) days after the end of each month during the Preferred Partnership Term or any Renewal Preferred Partnership Term hereof, Pivotal shall deliver to Preferred ASP Partner a report that states:

(a) the total number of proposals made by Pivotal with respect to the Products in the Service Area during the month, and (b) of those proposals, the number that included a proposal to provide the Products on a hosted basis.

5.3 Payment.    Accompanying each report required by Section 5.2, Preferred ASP Partner shall include payment for all applicable End User License Fees, Sublicense Fees and any applicable support or maintenance fees owing to Pivotal hereunder.   Preferred ASP Partner shall make payment of the Preferred Partnership Fee, Provider License Fee, and Provider Maintenance Fee as set forth in Schedule A. If Preferred ASP Partner has difficulty in collecting any fees from an End User and so informs Pivotal, Pivotal shall use reasonable efforts to assist Preferred ASP Partner wherever possible, at the Preferred ASP Partner's expense. In the event that an End User terminates its Customer Agreement with Preferred ASP Partner for any reason prior to the end of the Customer Agreement, Pivotal shall relieve Preferred ASP Partner of paying all future monthly fees with respect to such End User beginning with the month in which such termination occurs.

5.4 Records; Audit Rights.    Preferred ASP Partner shall maintain complete and accurate records to compute all amounts payable to Pivotal hereunder and shall retain such records for at least two  (2) years after effective date of any sublicense for any Products.  Upon fifteen (15) days written notice and during normal business hours, Pivotal or its agent may audit, inspect and copy such records to verify any payments due and owing to Pivotal hereunder. Any such review shall be at Pivotal's own expense, provided, however, if such audit discloses a shortfall of more than five percent (5%) in the amounts remitted by Preferred ASP Partner to Pivotal, Preferred ASP Partner shall reimburse Pivotal its reasonable out-of-pocket costs for such audit, together with any missed payments arising from the audit and the accrued interest thereon. If such an audit discloses that Preferred ASP Partner has overcompensated Pivotal, Pivotal shall, within ten (10) days from the completion of

the audit, refund any and all such overpayments to Preferred ASP Partner. All such information as described within this Section  5.4  shall   be   considered "Confidential Information" of Preferred ASP Partner as such is described within Section 6.2 hereof.

5.5 Interest on Overdue Amounts.    Each overdue payment of whatever kind from Preferred ASP Partner to Pivotal, or from Pivotal to Preferred ASP Partner, hereunder shall bear simple interest after its due date until paid in full at the lower of twelve percent (12%) per annum or such other rate as is permitted by applicable law.

5.6 Taxes, Fees and Permits.   Preferred ASP Partner shall be solely responsible for:

(a) the payment of any and all taxes, excises, duties or charges which may arise by or be related to the Services performed by Preferred ASP Partner, including taxes in the nature of withholding, sales or use taxes, but excluding taxes based on Pivotal's net income and any taxes applicable to the Preferred Partnership Fee and the Hosting Provider License Fee. If applicable tax laws or regulations require any withholding of income taxes owed by Pivotal, Preferred ASP Partner shall do so, shall promptly remit such sums to the appropriate tax authorities and shall promptly furnish Pivotal with documentation of the same in a form reasonable requested by Pivotal;

(b) workers compensation, comprehensive general liability or other insurance required by law;

(c) any permits, licenses and approvals as required by applicable law for Preferred ASP Partner to meet its obligations hereunder;

and Preferred ASP Partner shall promptly provide Pivotal with proof of compliance with all of the foregoing obligations on request.

## 6. Title and Confidential Information

6.1 Title in the Products.  Pivotal warrants to Preferred ASP Partner that  (a) it owns or otherwise lawfully holds all right, title or interest to the Products; (b) it has the authority to grant the licenses for the

(Continued)

Products herein; and (c) its execution and performance of this Agreement will not conflict with any other material agreement to which it is a party or by which it is bound. Pivotal shall retain all right, title and interest in the Products or their documentation and Pivotal Trademarks except as expressly licensed hereunder.

6.2 Confidential Information.     Pivotal and Preferred ASP Partner shall each keep in confidence all information transmitted to it by the other party hereunder that the disclosing party identifies as being proprietary and/or confidential or that, by the nature of the circumstances surrounding the disclosure, ought in good faith to be treated as proprietary and/or confidential (collectively, "Confidential Information"), and shall make no use of such Confidential Information except as permitted or required hereunder. Information in any form regarding any technical concepts and documentation, pre-release products, access numbers and passwords provided to Preferred ASP Partner by Pivotal shall be Pivotal Confidential Information. Pivotal and Preferred ASP Partner shall treat the terms and conditions of this Agreement as confidential; however, either party may disclose such information in confidence to its legal and financial consultants, shareholders and lenders and prospective shareholders and lenders as required in the ordinary course of such party's business, and who have entered into similar and binding confidentiality agreements. The receiving party's obligation hereunder shall extend for five (5) years following the disclosure of such Confidential Information.

6.3 Exclusions.  Confidential Information shall not include any information that:

(a) was in the receiving party's possession before receipt from the disclosing party;

(b) is or becomes a matter of public knowledge through no act, omission or fault of the receiving party;

(c) is rightfully received by the receiving party from a third party without a duty of confidentiality;

(d) is independently developed by the receiving party without use of or reliance

on the disclosing party's Confidential Information; or

(e) is required to be disclosed under operation of law, provided, however, a party proposing to make such a disclosure shall give prompt written notice thereof to the other party and shall render reasonable cooperation to limit the public release of such party's Confidential Information.

6.4 Pivotal Infringement Indemnity.    Pivotal shall defend, indemnify and hold Preferred ASP Partner harmless from and against any third party claim ("Third Party Claim") for loss, damage, liability or expense (including reasonable attorney's and administration fees) against Preferred ASP Partner that any Product or portion thereof infringes the patents, copyrights, trademarks, or other rights of any third party.

If a Product is held by a court of competent jurisdiction or is believed by Pivotal to infringe, Pivotal shall have the option, at its sole expense, to (a) modify the Product to be non-infringing; or (b) obtain for the Preferred ASP Partner a license to continue using the Product. If Pivotal determines that it is not commercially reasonable to perform either of the above options, then Pivotal may terminate the license and refund all fees paid during the term of this Agreement.

THIS INDEMNITY DOES NOT EXTEND TO ANY CLAIM BASED UPON (a) ANY ALLEGED INFRINGEMENT DUE TO THE COMBINATION BY PREFERRED ASP PARTNER OR A THIRD PARTY AT THE DIRECTION OF PREFERRED ASP PARTNER, OF THE PRODUCTS WITH OTHER ELEMENTS NOT PRODUCED BY PIVOTAL; (b) ANY PART OF THE PRODUCTS MODIFIED BY PREFERRED ASP PARTNER OR A THIRD PARTY AT THE DIRECTION OF PREFERRED ASP PARTNER, OR MODIFIED TO REQUIREMENTS, SPECIFICATIONS, DESIGNS OR FORMULAS PROVIDED BY PREFERRED ASP PARTNER, AN AGENT OF PREFERRED ASP PARTNER OR AN END USER; (c) ANY BREACH BY PREFERRED ASP PARTNER OF ITS OBLIGATIONS UNDER THIS AGREEMENT; OR (d) ANY REFUSAL

BY PREFERRED ASP PARTNER TO INSTALL AND USE A NON-INFRINGING VERSION OF THE PRODUCTS OFFERED BY PIVOTAL UNDER SECTION 6.4 SO LONG AS SUCH NON-INFRINGING PRODUCT HAS SUBSTANTIALLY IDENTICAL FUNCTIONALITY AS THE INFRINGING PRODUCT.

6.5 Mutual Indemnity. Each Party (the "Indemnifying Party") shall defend, indemnify and hold the other party (the "Indemnified Party") harmless from and against any claims for loss, damage, liability or expense (including reasonable attorney's and administration fees) arising out of or related to:

(a) any representations, acts or omissions of the Indemnifying Party, its agents or contractors, in connection with the Indemnifying Party's responsibilities and obligations to the Indemnified Party hereunder, or

(b) any material breach or violation of any of the Indemnified Party's intellectual property right by the Indemnifying Party, its agents or contractors.

6.6 Preferred ASP Partner Indemnification to Pivotal. Preferred ASP Partner shall indemnify, defend and hold Pivotal harmless from and against any damages awarded against Pivotal (including, without limitation, reasonable costs and legal fees thereby incurred) arising out of any Legal Action with respect to:

(a) any representations made by Preferred ASP Partner with respect to a Product other than any express representations and warranties of Pivotal contained in such Product's accompanying documentation;

(b) any First Level Maintenance or any modification, translation, customization or localization of the Products by Preferred ASP Partner or its agents other than First Level Maintenance that is directed by Pivotal and that is performed in a commercially reasonable manner by Preferred ASP Partner in accordance with such directions.

6.7 Claims for Indemnification. The Indemnified Party under this Article 6 shall give to the Indemnifying Party (a) prompt written notice of any Legal Action as promptly as possible and, in any case, not later than thirty (30) days of its first knowledge thereof; (b) sole control of the defense of any Legal Action; and (c) such assistance, at the Indemnifying Party's expense, as it may reasonably request to defend or settle such claim. The Indemnified Party shall not settle or compromise any Legal Action without the Indemnifying Party's express written consent. The Indemnified Party's material failure to comply with this Section 6.7 or any delay in notice to the Indemnifying Party that materially prejudices its ability to defend a Legal Action shall relieve the Indemnifying Party of its indemnification obligation under this Article 6.

7. **Warranties; Warranty Disclaimers; Liability Limits**

7.1 Pivotal hereby represents and warrants that the Products will (a) perform substantially in accordance with the Documentation applicable thereto; (b) operate in substantial conformity with the Documentation in the Preferred ASP Partner's hosting environment; and (c) not contain any virus, worm, Trojan horse or other routine intentionally designed to damage any hardware, software or data. NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PIVOTAL HEREBY DISCLAIMS ANY WARRANTY THAT (a) THE PRODUCTS OR ANY RELATED DOCUMENTATION, DATA OR OTHER MATERIAL PROVIDED HEREUNDER ARE MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE OR WILL BE ERROR- OR BUG-FREE; (b) ALL ERRORS OR BUGS DETECTED IN THE PRODUCTS OR DOCUMENTATION CAN OR WILL BE FIXED; (c) THE PRODUCTS WILL RUN WITHOUT INTERRUPTION OR DELAY; OR (d) MAINTENANCE FIXES OR UPGRADES WILL RUN WITHOUT CHANGES TO HARDWARE, DATA OR OPERATING ENVIRONMENT; provided, however, that the events disclaimed in clauses (a), (b), (c)

and (d) above will not materially impact the operation of the Products substantially in accordance with the Documentation.

7.2 EXCEPT FOR AN INTENTIONAL BREACH OF CONFIDENTIALITY OR DAMAGES RESULTING FROM AN INDEMNIFIED ACTION HEREIN, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY KIND OR AMOUNT (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS OR DATA, PROFITS, BUSINESS INTERRUPTION, OR LOSS OF BUSINESS INFORMATION,) RESULTING FROM ANY CLAIMS, DEMANDS OR ACTIONS ARISING OUT OF THIS AGREEMENT, THE PRODUCTS OR SERVICES HEREUNDER OR ANY DELAY OR FAILURE IN PERFORMANCE OR DELIVERY. EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

7.3 EXCEPT FOR DAMAGES RESULTING FROM AN INTENTIONAL BREACH OF CONFIDENTIALITY OR SECTIONS 6.4 OR 6.6, IF FOR ANY REASON ONE PARTY BECOMES LIABLE TO THE OTHER, OR THE OTHER'S CUSTOMERS, OR ANY END USER, OR ANY OTHER PARTY FOR DIRECT OR ANY OTHER DAMAGES FOR ANY CAUSE WHATSOEVER, IN CONTRACT OR TORT OR FOR OTHER CAUSE OF ACTION, IN CONNECTION WITH THIS AGREEMENT, THE PRODUCTS OR SERVICES HEREUNDER, OR ANY DELAY OR FAILURE IN PERFORMANCE OR DELIVERY, THE FOLLOWING LIMITATIONS OF LIABILITY SHALL APPLY:

(a) THE AGGREGATE LIABILITY OF EACH PARTY FOR ALL DAMAGES, INJURIES AND LIABILITY INCURRED BY THE OTHER, THE OTHER'S CUSTOMERS, ANY END USERS, AND ALL OTHER PARTIES IN CONNECTION WITH THIS AGREEMENT OR THE PRODUCTS AND SERVICES HEREUNDER, SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE TOTAL AMOUNT OF FEES PAYABLE (WHETHER PAID OR TO BE PAID) TO PIVOTAL HEREUNDER (INCLUDING WITHOUT LIMITATION THE PROGRAM FEE, THE PREFERRED PARTNER FEE, THE HOSTING PROVIDER LICENSE FEE, THE HOSTING PROVIDER MAINTENANCE FEE AND THE SUB-LICENSE FEES).

## 8. Term and Termination

8.1 Term. The Preferred Partnership Portion of this Agreement is effective as of the Effective Date and shall remain in full force for a period of five (5) years (the "**Preferred Partnership Term**"), unless earlier terminated in accordance with this Article 8. The term of the License granted pursuant to Section 2.2 hereof shall be perpetual. Notwithstanding the termination of the Preferred Partnership Term or any Renewal Preferred Partnership Term, the Preferred ASP Partner shall have the right to act as a Certified Preferred ASP Partner pursuant to this Agreement for the life of the License granted pursuant to Section 2.2 hereof.

8.2 Renewal. At the end of the initial Preferred Partnership Term or any renewal Preferred Partnership Term thereafter, this Agreement may be extended if both Preferred ASP Partner and Pivotal mutually agree to such an extension (the term of any such extension shall be called a "**Renewal Preferred Partnership Term**").

8.3 Insolvency, Bankruptcy, etc. Subject to the proviso below, a party may terminate this Agreement upon ten (10) days written notice thereof if the other party (a) applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such party; (b) makes a general assignment for the benefit of its creditors; (c) has a trustee, receiver or other custodian appointed for such party which is not discharged within sixty (60) days; (d) files for bankruptcy or reorganization under any bankruptcy law; (e) commences any dissolution or liquidation proceeding; or (f) ceases to conduct its business in the normal course thereof; provided, however, that in the event of a bankruptcy event relating to the Preferred ASP Partner, Pivotal agrees

that so long as the Preferred ASP Partner is meeting its obligations under this Agreement, Pivotal shall not terminate this Agreement for a period of twelve (12) months following the occurrence of such event.

8.4 Termination for Material Breach. A party may terminate this Agreement upon ten (10) days written notice thereof if the other party breaches a material provision hereof and fails to cure such breach within thirty (30) days written notice thereof by the non-breaching party. Such right to terminate shall be in addition to any other right hereunder or otherwise available to the non-breaching party under law. In addition to Pivotal's other rights and remedies, within ten (10) days of the termination of this Agreement by Pivotal pursuant to this Section 8.4, Preferred ASP Partner shall pay all remaining Preferred Partner and Maintenance Fees that would otherwise be due during the Preferred Partnership Term or any Renewal Preferred Partnership Term of this Agreement. In addition, Pivotal shall not be required to make any payment with respect to the Minimum Obligation that accrues following the date of termination. In addition to the Preferred ASP Partner's other rights and remedies, within ten (10) days of the termination of this Agreement by the Preferred ASP Partner pursuant to this Section 8.4, Pivotal shall pay all remaining payments required to be made for the remainder of the Preferred Partnership Term or any Renewal Preferred Partnership Term with respect to the Minimum Obligation pursuant to Section 3 of Schedule A hereto. In addition, the Preferred ASP Provider shall not be required to make any payment with respect to the Preferred Partnership Fee following the date of termination.

8.5 Termination of Preferred Partnership Portion of the Agreement by Preferred ASP Partner. The Preferred ASP Partner shall have the right to terminate the Preferred Partnership Portion of this Agreement upon ten (10) days written notice thereof if Pivotal fails to meet the Revenue Targets set forth in Section 3 of Schedule A hereto, and upon such termination, the parties shall have the rights set forth on Schedule A. Following such termination, the Preferred ASP Partner will

continue to be allowed to act as a Certified Preferred ASP Partner pursuant to the terms of this Agreement during the life of the License granted pursuant to Section 2.2 hereof.

8.6 Obligations on Termination. If this Agreement is terminated for whatever reason, and without prejudice to any other rights which either party may have:

(a) Except to the extent required to fulfill contractual obligations to End Users, each party shall immediately deliver to the other party or destroy (at the election of the other party) all Confidential Information of the other party then in the delivering party's possession or control and shall deliver a certificate attesting that all such Confidential Information has been so returned or destroyed;

(b) Each party shall refrain from further use of the other party's Confidential Information except to the extent required to fulfill contractual obligations to End Users;

(c) the parties agree to cease any joint marketing and selling of the Products and Services, however the parties may continue to market and sell their respective Products and Services separately; and

(d) Subject to Preferred ASP Provider's right to continue to act as a Certified Preferred ASP Partner following termination of the Preferred Partnership Portion of this Agreement, Pivotal and Preferred ASP Partner shall complete any contractual obligations to, and on behalf of, End Users (including maintenance services) entered into prior to the effective date of such termination and Preferred ASP Partner shall continue to be liable for its monetary obligations with respect to such End Users to Pivotal; provided, however, that in the event this Agreement is terminated by Preferred ASP Partner pursuant to Section 8.4, the Preferred ASP Provider shall have the right to renew any contract that is in existence on the date of termination, and the parties' obligations pursuant to this Section 8.6(d) shall extend to such renewed contracts.

9.  Pivotal Maintenance Services

Pivotal will provide the following support and maintenance services (the "**Services**") to Preferred ASP Partner during the life of the License granted pursuant to Section 2.2 hereof:

9.1  Support Coordinators. Preferred ASP Partner shall designate Preferred ASP Partner's authorized users (the "Support Coordinators") as it reasonably determines to be required to request and receive Remote Support from Pivotal. At least one Support Coordinator must be certified in Microsoft BackOffice products as well as have attended the Administering Relationship – Fundamentals course (or have equivalent experience with deploying and supporting a Pivotal system). In order to receive Remote Support on the Pivotal eToolKit or Toolkit, at least one Support Coordinator must have attended the Customizing Relationship – Fundamentals course. Pivotal will provide Remote Support only to the current designated Support Coordinators and to no other personnel of Preferred ASP Partner. Named Support Coordinators can be changed from time to time upon written notice by Preferred ASP Partner. Preferred ASP Partner acknowledges that it must have adequate Support Coordinators in order to optimize deployment and continuing administration of the Software.

9.2  Scope Of Maintenance Services. Pivotal shall use commercially reasonable efforts to provide the maintenance services for the Products ("Maintenance Services") set forth on Schedule G hereto in a professional and workmanlike manner to Preferred ASP Partner.

9.3  Software Updates/Upgrades. Pivotal shall provide to Preferred ASP Partner all updates and upgrades to the Products and existing components of the Products commercially released by Pivotal provided that maintenance and support are continued to be purchased by the Preferred ASP Partner. Pivotal shall not be required to provide the Preferred ASP Partner with any updates or

upgrades following termination of this Agreement, for whatever reason.

9.4  Versions Supported. Services will only be provided for the current release and version of the Products in effect from time to time, and the immediately preceding releases of the Products for a period of one year from the date of issuance of the current release.

9.5  Exclusions. The following items are excluded from Maintenance Services: (a) any software code that has been modified by Preferred ASP Partner or any third party, including any new applications or derivative products; (b) any software other than the current release and the immediately prior release thereof (the immediately prior release will only be supported for a period of one year from the most current release); (c) any errors, damage or problems in the Products or its operation caused by failure to provide a suitable operating environment or incompatible configuration, or (d) any accidental damage to the Products. Pivotal may charge Preferred ASP Partner, on a time and materials basis (including reimbursement for out-of-pocket expenses), for providing additional support for items excluded from Maintenance Services.

9.6  Reactivation. If Preferred ASP Partner discontinues or has its Maintenance Services terminated for any reason, Preferred ASP Partner may reactivate Maintenance Services only upon (a) Pivotal's written consent thereto; (b) payment of the then-current Annual Maintenance Fee and all Annual Maintenance Fees for Maintenance Periods since discontinuation or termination of such services.

10.  **General**

10.1 Governing Law; Choice of Forum. This Agreement shall be governed in all respects by the laws of the State of North Carolina, excluding its choice of law rules and excluding the United Nations Convention on Contracts for the International Sale of Goods.

10.2 Export Control. Preferred ASP Partner shall not export or re-export, directly or

indirectly, the Products or any documentation therefore, or any Confidential Information of Pivotal to any countries outside the United States and Australia except as permitted under the U.S. Commerce Department's Export Administration Regulations.

10.3 Assignment. Neither this Agreement nor any right or obligation arising hereunder may be assigned by either party, in whole or in part, without the prior written consent of the non-assigning party which shall not be unreasonably withheld or delayed, except that (a) either party may make such an assignment in any merger or acquisition or sale of all or substantially all of its assets if the surviving or acquiring entity agrees in writing to be bound thereby, (b) Preferred ASP Partner shall have the right to make such an assignment to any entity that is acquiring this Agreement and assuming all of Preferred ASP Partner's End User contracts that have been entered into pursuant to this Agreement if the acquiring entity agrees in writing to be bound hereby, and (c) Preferred ASP Partner shall have the right to grant a sublicense to any person or entity and assign any End User Agreement to such person or entity, as long as such person or entity agrees in writing to be bound hereby. Any attempted assignment in violation of this Section 9.3 shall be null and void and shall have no force or effect. Subject to the foregoing restrictions on assignment of this Agreement by either party, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto.

10.4 Non-Solicitation. Neither party shall employ nor solicit employment of anyone who is employed by the other party and actively engaged in the relationship between the parties without the prior written consent of such other party, unless such other party has not employed such individual for at least ninety (90) days.

10.5 Notices. Any notice under this Agreement shall be in writing and shall be delivered by regular mail, first class postage prepaid, by personal delivery, by facsimile or by overnight or express courier service, addressed to the attention of such party's

primary contact as provided in the Cover Section of this Agreement. Any notice hereunder shall be deemed delivered three (3) days after deposit in the regular mail if properly addressed, upon personal delivery, upon electronic confirmation of facsimile receipt, or one (1) day after delivery by overnight or express courier service if properly addressed.

10.6 Severability. If any provision of this Agreement is found invalid or unenforceable under any laws or regulations applicable thereto, such provision shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any other provisions of this Agreement.

10.7 Entire Agreement. This Agreement is comprised of the Cover Section hereof and any Schedules listed in the Cover Section of this Agreement and constitutes the final and complete expression of all the terms of the agreement between the parties with respect to the subject matter hereof. If there is any conflict between the Cover Section and any attached Schedule, the Cover Section shall control (except with respect to Schedules A and B, which shall take precedence over the Cover Section). This Agreement supersedes all prior proposals, understandings and negotiations concerning the matters specified herein. Any representations, oral statements, promises or warranties made by either party that differ in any way from the terms of this Agreement shall be given no force or effect.

10.8 Waiver; Amendment. No waiver of any right arising from any breach or failure to perform shall be deemed to be a waiver of any future such right or of any other right arising under this Agreement. No addition to or amendment, modification or waiver of any provision of this Agreement shall be binding upon either party unless made in writing and signed by a duly authorized representative of such party.

10.9 Headings. The division of this Agreement into articles, sections, subsections and Schedules and the insertion of headings are for convenience and reference only and shall not affect the construction or interpretation of this Agreement.

10.10 Injunctive Relief. The Products are a strategic and valuable asset of Pivotal, which includes trade secrets. Any breach of the terms of Section 6 of this Agreement or of confidentiality by the Preferred ASP Partner hereunder will result in harm and economic loss not compensable by monetary damages. Pivotal shall be entitled to seek an injunction against such breach or threatened breach, in addition to other legal or equitable remedies. The Services are a strategic and valuable asset of Preferred ASP Partner, which includes trade secrets. Any breach of the terms of Section 6 of this Agreement or of confidentiality by Pivotal hereunder will result in harm and economic loss not compensable by monetary damages, Preferred ASP Partner shall be entitled to seek an injunction against such breach or threatened breach, in addition to other legal or equitable remedies.

10.11 Force Majeure. Neither party will be liable for any failure to perform due to unforeseen circumstances or causes beyond its reasonable control, including, but not limited to, acts of God, war, embargoes, acts of civil or military authorities, fire, flood, accident, or strikes. In the event of force majeure, time for delivery or other performance will be extended for a period equal to the duration of the delay caused thereby, but in no event shall such delay exceed three (3) months.

10.12 Websites. Preferred ASP Partner acknowledges and agrees that access to and use of any Pivotal website is governed by the terms and conditions contained on such site, as amended from time to time in its sole discretion. Pivotal acknowledges and agrees that access to and use of any Preferred ASP Partner website is governed by the terms and conditions contained on such site, as amended from time to time in its sole discretion.

IN WITNESS WHEREOF the parties have entered into this Agreement on the Effective Date set forth on the Cover Sheet. This Agreement is non-binding until executed by all parties.

INTERPATH COMMUNICATIONS, INC.

_____
Authorized Signature

G. Perry, EVP Business Development.
Name and Title

**PIV⬤TAL**
Email: info@pivotal.com
Web: www.pivotal.com

Pivotal Corporation
10210 NE Points Drive
Suite 400
Kirkland, WA
USA 98033

PIVOTAL CORPORATION

_____
Authorized Signature

A. Beaulieu, General Counsel
Name and Title

Pivotal Corporation
300 – 224 West Esplanade
North Vancouver, B.C.
Canada V7M 3M6

INTERPATH COMMUNICATIONS, INC.

_____
Authorized Signature

Louis Salvmore Jr.      Executive Vice President, Finance &
Name and Title                           Administration & CFO

Schedule A

## Products, Territory, Revenue Targets and Fees

### 1. Products

1.1 <u>Pivotal Products.</u> The following Products are currently commercially available from Pivotal. Additional new Pivotal Products will be made available to Preferred ASP Partner as soon as they are introduced by Pivotal.

| Type | Software description |
|---|---|
| User | Pivotal eRelationship™ 2000 IntraHub Employee Access License |
| | Pivotal eRelationship™ 2000 Customer Hub™ Customer Access License |
| | Pivotal eRelationship™ 2000 Partner Hub™ Partner Access License |
| | Pivotal eSelling 2000 |
| | Pivotal Digital Conversations |
| Site | Pivotal Lifecycle Engine ToolKit™ Site License |
| | Pivotal Lifecycle Engine ToolKit™ eBusiness Builder Site License |
| | Pivotal Interaction Engine |
| | Pivotal Intelligence Engine |
| | PivotalLink Engine |
| | Pivotal Web.Net Engine |
| | Pivotal Anywhere Engine (wireless) |
| | Rapid Productivity Methodology |
| Enterprise | Pivotal Lifecycle Engine ToolKit™ Enterprise License |
| | Pivotal Lifecycle Engine ToolKit™ eBusiness Builder Enterprise License |
| Server | Pivotal eRelationship® 2000 Server License, including the Pivotal Customer Management System™ |
| Third Party | Seagate Crystal Reports™ Pro- Single User |
| | Microsoft SQL Server 7 |
| | Microsoft SQL Internet Connector |

SCHEDULE A – page 2

## 2. Territory

2.1 Service Area. The Service Area of this Agreement shall be the United States of America and Australia, but excluding credit unions within the Service Area. The parties agree to discuss extending Pivotal's right to partner with other vertical niche market ASP providers subject to the approval of Preferred ASP Partner, not to be unreasonably withheld.

## 3. Revenue Targets

3.1 Monthly Fee Obligation.

(a) Pivotal will have a minimum monthly obligation ("Minimum Obligation") to introduce Customers to Preferred ASP Partner that enter into contracts that generate EBITDA (calculated by the Preferred ASP Partner) to Preferred ASP Partner in the minimum amount set forth below:

| Months | Minimum Obligation per Month |
|---|---|
| 0 to 3 | $ 20,000 |
| 4 to 6 | $ 40,000 |
| 7 to 9 | $ 60,000 |
| 10 to 12 | $ 80,000 |
| 13 to 18 | $ 90,000 |
| 19 to 24 | $110,000 |
| 25 to 36 | $120,000 |
| 37 to 48 | $150,000 |
| 49 to 60 | $200,000 |

(b) Pivotal's Minimum Obligation will be reduced by the greater of (a) 20% of revenue generated by Preferred ASP Partner from customers referred by Pivotal and which become an End User (other than a Hosted User) for a given month, or (b) the actual amount of EBITDA (calculated by the Preferred ASP Partner) generated during a month by such customers. The 20% level set forth in clause (a) above will be adjusted quarterly to reflect Preferred ASP Partner's actual EBITDA margin for the prior quarter (but in no event shall such level be reduced to less than 20%). To the extent Pivotal fails to meet its Minimum Obligation for any month, Pivotal agrees to pay the difference between the fees generated by Pivotal and the Minimum Obligation directly to Preferred ASP Partner by either using the services for its own internal use, or paying the amounts directly to Preferred ASP Partner within ten (10) days following the end of such month. Pivotal shall have the right to conduct such examination as is reasonably required to confirm such EBITDA margin.

3.2 Minimum Customer Obligation.

(a) Pivotal will have a minimum obligation to help deliver the following minimum number of Customers (a Customer is an enterprise that contracts for a minimum of 100 seats of the Pivotal Product for a minimum 36 month term) to Preferred ASP Partner:

| Month | Aggregate No. of Customers |
|---|---|
| 12 | 24 |
| 18 | 39 |
| 24 | 69 |
| 30 | 93 |
| 36 | 123 |
| 42 | 153 |

| 48 | 183 |
|----|-----|
| 54 | 219 |
| 60 | 255 |

(b) Pivotal is targeting to assist in the delivery of two customers per month in order that the Minimum Obligation is achieved. In the event that this number is not achieved at the end of a given period, Pivotal will have a maximum of three months to meet the next target.

(c) If Pivotal does not meet the minimum requirements as defined by month 12, then Preferred ASP Partner may terminate the Preferred Partnership Portion of this Agreement at any time and is not obligated to pay the remaining payments relating to the Preferred Partnership Fee, with the exception of the initial $500,000 payment. The remainder of this Agreement, which allows Preferred ASP Partner be a Certified Preferred ASP Partner, shall remain in full force and effect for the life of the License granted pursuant to Section 2.2 hereof.

(d) If Preferred ASP Partner terminates the Preferred Partnership Portion of this Agreement pursuant to the above, Pivotal will not be obligated to make any further Minimum Obligation other than the then current payment and the Minimum Obligation payment that would have been due the month following the month in which termination occurred.

4. **Fees**

4.1 <u>Program Fee</u>. Preferred ASP Partner Program Fee of $50,000 has previously been paid through prior agreements, and no further amount is outstanding.

4.2 <u>Preferred Partnership Fee</u>.   Preferred Partnership Fee payable to Pivotal is Five Million Dollars ($5,000,000) and is payable as follows:

a) $500,000 payable on or before June 25, 2002;

b) $750,000 payable on or before June 25, 2003;

c) $1.0 Million payable on or before June 25, 2004;

d) $1.25 Million payable on or before June 25, 2005; and

e) $1.50 Million payable on or before June 25, 2006.

4.3 <u>Hosting Provider License Fee</u>.   Hosting Provider License Fee payable to Pivotal is Two Million Dollars ($2,000,000.00). This amount is due and payable in its entirety on or before June 30, 2001.

4.4 <u>Hosting Provider Maintenance Fee</u>. Hosting Provider Maintenance Fee payable to Pivotal for year 1 is 15% of the Hosting Provider License Fee, and in subsequent years, Preferred Preferred ASP Partner may renew maintenance at 9% of the Hosting Provider License Fee. For the first year of this Agreement, the Hosting Provider Maintenance Fee shall be paid quarterly in arrears. Thereafter, all such fees are payable annually, in advance.

## Schedule B

### Discounts and Commissions

1. <u>Sublicense Fees to Pivotal.</u> Sublicense Fees payable to Pivotal for each End User shall be equal to the greater of (a) 40% of the End User price charged by Preferred ASP Partner for the Products or (b) the lowest per-End User fee for the Products paid to Pivotal by any of Pivotal's other ASP or Reseller partners or any other customer (with respect to customers who are not ASPs or Resellers, the determination of the lowest per-End User fees shall be based on the average of the three (3) lowest per-End User fees charged to such customers). Pivotal shall provide the Preferred ASP Partner with written notice of such lowest per-End User fee, and the Preferred ASP Partner shall have the right to conduct such examination as is reasonably required to confirm such lowest per-End User fee.

2. <u>Commissions on Pivotal-direct licensing (leveraged deals).</u> Pivotal agrees to use its reasonable efforts to compensate Pivotal sales executives for the sale of hosted Pivotal applications in a manner consistent with Pivotal's existing compensation for up-front software license sales, so as to facilitate the deployment of Pivotal applications on a hosted basis and the sale of related hosting services. Pivotal shall provide the Preferred ASP Partner with written notice of all changes in the way Pivotal sales executives are compensated promptly after making any such change, and Preferred ASP Partner shall have the right to review such compensation. In order to ensure that its sales executives can effectively sell the Products in a hosted environment, Pivotal agrees to provide all its sales executives with training relating to the ASP model.

   Due to the strategic nature of customer interaction software solutions, some End Users insist upon dealing directly with the software vendor. When Pivotal is required to take an active sales role and sell directly to an End User, Pivotal's will compensate the Preferred ASP Partner for the role it took in completing the Pivotal software sale.

   If Preferred Preferred ASP Partner refers a prospective End User to Pivotal and Pivotal thereafter provides a license or sublicense of the Products to such customer within 105 days of Preferred Preferred ASP Partner's referral, Pivotal shall compensate Preferred Preferred ASP Partner through a commission payment of no less than ten percent (10%) on such sums received from such customer.

   Note that:

   - Commissions are based on the revenue from all Pivotal licenses and sublicenses sold to an End User in the initial sales agreement.

   - All commissions will be based on the amount actually received by Pivotal for the Products.

   Any commission fees payable will be paid to the Preferred ASP Partner upon receipt in full of payment from the End User.

Schedule C

## Certification and Training

1. Certification

   1.1 Certification. Preferred ASP Partner must maintain at all times the following Minimum Certification Criteria (for each participating location) in order to establish and maintain its status as a Pivotal Certified Preferred ASP Partner (Preferred ASP Partner shall have six (6) months from the Effective Date to establish the Minimum Criteria or risk termination):

   - Designated Sales & Marketing Personnel
   - One (1) Pivotal Certified Customization Master
   - Two (2) Pivotal Certified Administrators
   - One (1) Microsoft Certified Systems Engineer

   1.1 Training. The training requirements necessary to become a Certified Customization Master or a Certified Administrator are outlined below. Upon the release of any major new Pivotal Product or upgrade, the certified employee(s) of Preferred ASP Partner must become re-certified on the new Product or upgrade within three (3) months of the release of such Product or upgrade for Preferred ASP Partner to maintain its status as a Pivotal Certified Preferred ASP Partner. Any change of the personnel listed above must be reported to Pivotal, and Preferred ASP Partner will make arrangements for replacements, where necessary, within sixty (60) days of a loss of any of the above personnel to meet the Minimum Criteria, Preferred ASP Partner is required to complete Pivotal Training outlined below. All Pivotal training must be taken within six (6) months from the Effective Date.

| Pivotal Certified Customization Master: | Training Days |
|---|---|
| Using | 2 |
| Customizing Pivotal eRelationship 2000 Fundamentals | 4 |
| Customizing Pivotal eRelationship 2000 Advanced Techniques | 4 |
| Customizing Pivotal eRelationship 2000 Customer Hub & Partner Hub | 4 |
| Pivotal Certified Administrator: | |
| Using eRelationship | 1 (2 x 2 person) |
| Administering Pivotal eRelationship 2000 Fundamentals | 8 (4 x 2 person) |
| Administering Pivotal eRelationship 2000 Advanced Techniques | 4 (2 x 2 person) |
| Administering Pivotal eRelationship 2000 Web Solutions | 2 (1 x 2 person) |
| Other | |
| Sales & Demo Training | 3 (3x 1 person) |
| Product/Demo training | 2 (2 x 1 person) |
| Total Training Days: | 34 |

## Schedule D

## RESERVED

Schedule E

### Sample Service Level Agreement

# Service Level Agreement

(This is a Service Level Agreement ("SLA") subject to the Enterprise Application Service Agreement between Interpath and #02 ("Customer") dated #04 (the "Master Agreement"). Defined terms from the Master Agreement have the same meaning in this SLA.)

## Contents

This SLA contains the following sections:

1.      Service Definition

2.      Event Notification Form

3.      Setup and Provisioning

4.      Technical Support

5.      Problem Support

6.      Scheduled Outages

7.      Service Restoration

8.      Service Availability

9.      Rebates

10.     Security

11.     Records & Reporting

12.     Special Conditions

13.     Dictionary

Schedule 1. Special Conditions

Annexure 1. Event Notification Form

Annexure 2. #02's Specifications

| This SLA is an attachment as provided for in the Master Agreement and must be read and interpreted subject to the Master Agreement. | |
| --- | --- |
| SIGNATURES | |
| Signed on behalf of Interpath | Signature: |
| Name (Block Letters): | |
| Title: | |
| | |

Interpath Preferred ASP Partner Agreement 0601

| Signed on behalf of Customer | Signature: |
|---|---|
| Name (Block Letters): | |
| Title: | |
| DATED: | |

## Service Definition

The Services covered under this SLA, including any standard Interpath Products, are those set out in detail in the Specification Sheet ("SS") dated #07.

## Event Notification Form

The Event Notification Form will be the agreed protocol for communications between Interpath and Customer dealing with various procedures specified in this SLA. Customer must specify in the Event Notification Form one or more authorized persons, or a class or group of persons, from whom Interpath may accept communications (each a "Customer Authorized Representative").
A copy of the form is attached to this SLA.

## Setup and Provisioning

## Change Requests

A Change Request must be submitted to Interpath by either of the following:

- Email, to change@interpath.net; or

- Fax, to (919) 253-6887.

A Customer Authorized Representative must submit the Change Request.

## Elements Necessary for Service Establishment or Change

The information to be included in a Change Request includes:
*Functional Requirement*, e.g., access for all staff a particular product function
*Specific Requirement*, e.g., archive our database to a new back-up server.

Interpath will provide Customer with a generalized change request form which shall be used for general changes such as, but not limited to, requests to change alerts and notification levels, and requests to change or enhance Customer's application.

## Response to Change Request

Interpath will use its best efforts to acknowledge its receipt of a Change Request within 4 hours. The acknowledgement will be to the Customer Authorized Representative making the request. Interpath will automatically provide notification of physical and electronic receipt of any Change Request.

Interpath's acknowledgement will specify whether the Change Request can be fulfilled, and if so, Interpath's estimate of the timeframe for fulfillment and the proposed cost of the Service Establishment or Change. If Interpath requires further time to fully respond to the Change Request, Interpath will as its initial response to the Change Request advise Customer of an estimate of the period Interpath requires before it expects to be able to fully respond to the Change Request.

The only variations to the above are as follows in Table 3.1:

TABLE 3.1

| Service / Service | | Service Description | Not /col xumit |
|---|---|---|---|
| #7. | | | |
| #08 | #09 | | #10 |
| #08 | #09 | | #10 |

## Service Establishment and Change

Interpath will establish new Services or make changes to existing Services as soon as possible following agreement with Customer on the terms of the Service Establishment or Change and, if applicable, the receipt from any Providers of the elements necessary for the Service Establishment or Change.

Interpath will use reasonable efforts to provide new or additional services within 24 to 48 hours of receipt of all the necessary content, application information, equipment and other elements necessary for provisioning and setup. Setup and provisioning times are often affected by factors outside Interpath's control and consequently these timeframes can vary.

Technical Support

## Availability

Interpath will provide Technical Support 24 hours per day, 7 days week.

## Requests for Support

A Technical Support Request must be submitted to Interpath by either of the following:

- Email, to **support@interpath.net**; or
- Telephone to the Interpath Support Line on **(800) xxx-xxxx**, if the requirement needs discussion, followed by confirmation email.

A Technical Support Request must be submitted by a Customer Authorised Representative.

If Interpath provides Customer with a pro forma Technical Support Request form, Customer will use that form for the submission of Technical Support Requests.

### Response to Technical Support Requests

Interpath will respond to a Technical Support Request that is not a Problem within 1 hour during Business Hours or if the Request is made outside Business Hours then within 2 hours of commencement of Business Hours.

The only variations to the above are as follows in Table 4.1:

TABLE 4.1

| Service/Service | Service Description | Confirmation |
|---|---|---|
| #7 | | |
| #08 | #09 | #10 |
| #08 | #09 | #10 |

Problem Reporting

## Availability

Interpath will provide Problem Support 24 hours per day, 7 days week.

## Problem Report

Customer must report Problems identified by Customer to Interpath by calling the Interpath Support Line on (800) xxx-xxxx.

## Problem Reports

Customer must assist Interpath by describing in a Problem Report where possible:

- Customer Name (Customer)
- Service details, including, if known, the relevant Service, Service Description, Service ID, and specifically any relevant component of the Service, Service Description or Service ID that is experiencing the Problem
- Brief description of the Problem
- Name and contact information of the relevant Customer Contact.

## Response to a request for Problem Support

### Initial Acknowledgment Time

Once a Problem is identified, Interpath will report to Customer within the specified response time for the relevant service set out in Table 5.1 below, or if no response time is specified then within one hour from the time that the Problem was logged or as soon thereafter as is reasonably practical.

### Response Process

Interpath will make an initial response to the Customer Contact, or, if this person is not available, then to another Customer Authorized Representative.

### Response Information

Interpath will provide Customer, as part of its response, all known information about the Problem including the information in Table 5.1 below.

### Update to Response

Interpath will update the Customer Contact as often as Interpath considers it to be reasonable or if an update period is set out in the table below, then within each interval of that period. Interpath will use its best efforts to immediately notify the Customer Contact if Interpath's estimate for Service Restoration varies from the estimate provided in the initial response. If the Customer Contact is not available, Interpath will contact another Customer Authorized Representative.

TABLE 5.1

| | |
|---|---|
| Specified or Escalation or Owner for Service Ability | #07 |
| Problem Report | Time when Problem occurred:<br>Likely cause of Problem:<br>Estimate for Service Restoration:<br>Other material information: |
| Initial Acknowledgment Time | 30 minutes for all Services |
| Update response interval | 30 minutes or sooner if new information is discovered relevant to Service Restoration |

## Scheduled Outages

### Acknowledgment

Customer acknowledges that Interpath will implement Scheduled Outages from time to time.

### Customer Approval

Interpath will use its best efforts to obtain approval from Customer to undertake a Scheduled Outage, whenever possible, unless approval is specified as not required. Scheduled Outage events have the corresponding approval level as indicated in Table 6.1 below:

TABLE 6.1

| Event | Approval |
|-------|----------|
| Changes to Customer equipment | Required |
| Changes to other equipment affecting Customer services | Required |
| Provider Planned Outages | Not Required |

### Scheduling

Interpath will utilize its best efforts to schedule Scheduled Outages at the times of minimum User traffic on the Services. If a time window for Scheduled Outages is specified in the table below, Interpath will schedule the Scheduled Outages within that time window.

### Notification

When required, Interpath will, within a reasonably time, notify a Customer Authorized Representative of any proposed Scheduled Outage. Notification will include:

- the purpose of the Scheduled Outage
- the time the Scheduled Outage is to occur
- an estimate of the duration of the Scheduled Outage
- any other information listed in the table below.

On a case by case basis, Interpath will discuss with Customer any Scheduled Outage that requires, or is likely to require, an outage of greater than four (4) hours. Interpath will use its best efforts to give Customer the maximum possible notice of such proposed Scheduled Outage.

Interpath will perform within the minimum notification times for Scheduled Outages as indicated in Table 6.2 below:

**TABLE 6.2**

| Event | Outage Time | Notification Time |
|-------|-------------|-------------------|
| Interpath Maintenance Activity | 30 minutes | 1 day |
| Interpath Maintenance Activity | 1 Hour | 2 day |
| Interpath Maintenance Activity | 2 hours or greater | 1 week |
| Provider Planned Outages | As advised by Provider | Within 1 hour of notice to Interpath |
| Other information to be included in notification of Scheduled Outage | #13 | |
| Time window for Scheduled Outages | #14 | |

## Failure to Meet Planned Periods for Service Restoration

If Interpath fails to establish Service Restoration as planned for the Scheduled Outage, Interpath will contact a Customer Authorized Representative with updates to the estimated time for Service Restoration. If Interpath is responsible for the failure to achieve the planned period for Service Restoration, a Downtime Rebate will be payable as set out in Section 9. If one of Interpath's Providers is responsible for the failure to achieve the planned period for Service Restoration and Interpath receives a rebate from that Provider, a Third Party Rebate may be payable as set out in Section 9.

## Service Restoration

## Measurement of Period for Service Restoration

Interpath will measure the duration of time for Service Restoration as the period from the time when the Problem or Disaster is logged as having occurred, or when a Scheduled Outage commences, until the time when Service Restoration is achieved.

## Standard Problems

Interpath will use its best efforts to provide Service Restoration after the occurrence of Standard Problems in accordance with Table 7.1 below

TABLE 7.1

| Percentage of Standard Problems | Period for Service Restoration |
|---|---|
| 80 % | 2 hours |
| 87 % | 4 hours |
| 93 % | 6 hours |
| Remaining 7 % | Interpath to use best efforts to restore |

## Non-Standard Problems

Interpath will use its best efforts to implement a work-around to a Non-Standard Problem as soon as practicable after the occurrence of the Problem, but Interpath does not make any commitment to Service Restoration within any particular period of time in such instances. Security incidents such as denial of service attacks are considered Non-Standard problems.

## Disaster Recovery

Interpath will notify a Customer Authorized Representative as soon as possible after a Disaster has occurred. The notification will include details of the cause and extent of the Disaster and, if possible, an estimate of the likely duration of the period until Service Restoration.

Standard Service Restoration time from a Disaster will depend on the nature and extent of the Disaster. Interpath will use its best efforts to deliver Service Restoration:

- from electrical disaster within 1 day;
- from physical disaster within 30 days.

Customer acknowledges that Interpath's Disaster recovery policy is based upon redundant architecture and provides for a Facility at another Interpath Internet Business Center (IBC) being scaled to provide functionality and capacity in order to meet existing service delivery commitments to its customers. Interpath will use its best efforts to provide replication of the Services on a Facility at its alternative IBC as soon as practicable after the occurrence of the Disaster, subject to any requirements or limitations of

any third party including Interpath's Providers, insurers or financiers relating to the Facility or the IBC and the equipment and software in use by Interpath in providing the Services and, unless Interpath has expressly agreed as part of the Services to provide replication without additional cost to Customer, subject to an agreement between the parties on the fees for these Services.

## Baseline Structure

Customer agrees that the Baseline Structure for the Customer system requires restoration of the hardware and software components are as indicated in Table 7.2 below:

TABLE 7.2

| Service/Service Description and Service ID | Baseline Structure |
|---|---|
| #7 | |
| #08 | #15 |
| #08 | #15 |

Further specifications of the Baseline Structure are only applicable if attached hereto in writing and signed by both Interpath and Customer.

## Service Availability

Interpath will use its best efforts to provide Service Availability in relation to certain of its Services as measured by Satisfactory User Sessions or other agreed measures determined for Service Availability, at the Service Availability rates set out below.

### Satisfactory User Sessions

Satisfactory User Sessions for the Interpath Services are indicated in Table 8.1 below:

TABLE 8.1

| Services | Satisfactory User Sessions |
|---|---|
| Web Hosting Service | Ability to see the #16 web site from an external browser connection |
| Enterprise Email Service | Ability to send and receive email |
| Financial Transaction Server Service | Ability to process credit card authorizations in real time |
| Colocation Service | Ability to see the #16 web site from an external browser connection |

### Service Availability Rates

Service Availability is measured on an individual service basis. The Service Availability Rates and corresponding applicable measures are as indicated in Table 8.2 below:

TABLE 8.2

| Service/Service Description and Service ID | Service Availability Rates | Equivalent/Annual Outage Times |
|---|---|---|
| #7 | | |
| #09 #08 | #17 % | #18 hours per annum |
| #09 #08 | #17 % | #18 hours per annum |

Interpath Preferred ASP Partner Agreement 0601

Only the Outage types as indicated in Table 8.3 below will be counted towards the Service Availability calculation:

TABLE 8.3

| Outage Type | Criteria |
|---|---|
| Unintended Outages | Caused by actions or omissions exclusively within Interpath's control. |
| Scheduled Outages | Caused by actions or omissions exclusively within Interpath's control, but only for the period exceeding the planned period from commencement of the Outage until the time of Service Restoration. |

## Scalability

Customer acknowledges that the Services are by their nature computer based and that the standards to which the Services will operate are limited by the computing resources and other resources and environments allocated for the provision of the Services. Interpath has used its best efforts to provide Service resources based on estimates of maximum User traffic and software application performance provided by Customer as set out in Table 8.4 below, or in the Specifications. The Customer acknowledges that additional resources will be required at additional cost to the Customer to provide for greater traffic levels and different performance measures than are indicated below.

TABLE 8.4

| Service & Service Description | Maximum User Traffic/Software Requirement |
|---|---|
| #7 | |
| #08 | #19 |
| #08 | #19 |

## Performance Measurement and Tracking

Customer will provide a standardized use case which Interpath will use to do system performance threshold measurement. These measurements will define the performance bounds to which this SLA holds. Interpath will monitor the standard performance metric and will provide monthly reports as to the Customer's current usage and also alert on exceptions to these performance metrics.

| Performance Metric | Performance Threshold |
|---|---|
| #7 | |
| #08 | #19 |
| #08 | #19 |

| | |
|---|---|
| | |
| | |

## Rebates

## Downtime Rebate

Interpath will provide Customer with a Downtime Rebate in accordance with the table below. The Downtime Rebate will be calculated on the basis of individual Services. The provision of the Downtime Rebate is not an admission of liability by Interpath and does not waive in any way the limitations and exclusions of liability contained in the Master Agreement.

| Percent Uptime | User Outage Hours | Rebate (as a percent of the monthly fees) |
|---|---|---|
| 100% - 99.0% | Less than 84 hours | Zero |

Interpath Preferred ASP Partner Agreement 0601

| 98.9% - 98.6% | Exceeding 84 up to 120 hours | 4% |
| 98.5% - 97.9% | Exceeding 120 up to 180 hours | 8% |
| 97.8% - 96.6% | Exceeding 180 up to 300 hours | 12% |
| Less than 96.6% | Exceeding 300 hours | 17% |

The Downtime Rebate will be calculated quarterly in arrears based on a quarterly cumulative assessment by Interpath of the likely annual Downtime, adjusted at the end of each quarter and with a final adjustment at the end of each year. If applicable, at the end of each quarter, Interpath will provide a credit, or charge, for the amount required to adjust the amount of likely Downtime Rebate for each year. At the end of each year of the Term, if a final Downtime Rebate is due for the period to the end of the year of the Term, Interpath will credit the amount with the monthly statement. If Customer must repay an adjusted amount to Interpath, Customer must pay such amount as invoiced by Interpath within 7 days of invoice. If the end of a Term is not the end of a year of measurement, the amount of the Downtime Rebate will be calculated on a proportionate basis for days expired.

## Third Party Rebates

Interpath will pay a Third Party Rebate to Customer if any of its third party Providers has failed to supply services to Interpath, as contracted therefore, which causes an Outage or is otherwise responsible for an event that causes an Outage, if the third party's failure has directly caused Interpath to fail to provide Service Availability to Customer as required under this SLA and if the third party has paid a rebate to Interpath. Interpath does not warrant that a rebate will be payable to Interpath in those circumstances and is not required to take legal action against a third party Provider to recover any such rebate or damages. Interpath will not provide any rebate or otherwise be responsible to Customer for any loss or damages suffered or incurred by Customer caused by a third party Provider's failure to supply services to Interpath or otherwise being responsible for causing an Outage in excess of the amount of the Third Party Rebate (if any) paid by Interpath to Customer and attributed by Interpath to Customer's loss or damages.

### Security

The configuration of the firewall services included in the Services provided to Customer as indicated in Table 10.1 as follows:

TABLE 10.1

| Serviced | Configured | Other characteristics |
|---|---|---|
| #08 | #20 | #21 |

## Records and Reporting

### Records

Interpath will maintain a Service Activity Log. Interpath will include in the Service Activity Log information on Changes, Technical Support, Scheduled Outages, Problems, Disasters and any other Outages and Problem Support.

Each event and actions taken to restore the Services after each event will be recorded in the Service Activity Log as follows.

• Nature of event.

• Effect of event.

• Receipt time of Change Request, Technical Support request, Problem Report.

     • Commencement time and duration of Scheduled Outage, Problem, Disaster or other Outage.

- Cause/Reason for Scheduled Outage, Problem, Disaster or Outage.
- Actions taken to achieve Service Restoration in the case of a Problem, Disaster or other Outage not being a Scheduled Outage.

## Reporting

Interpath will provide Customer with a monthly report on the Services and the systems directly supporting the Services. Reports are available as Word or HTML documents.

Interpath's standard report addresses the following matters:

## Normal Operation of the Services, including:

- Service Availability of all Services.

## Service Activity Log, including:

- All Scheduled Outages and all other Outages
- Preventative measures taken to protect against future unscheduled Outages
- Technical Support Requests including the status of these requests
- Change Requests including the status of these requests.

Variations to the standard report are represented in Table 11.1 which follows:

**TABLE 11.1**



| Normal Operation of the Services |
|---|
| #22 |
| Service Activity Log |
| #23 |

## Special Conditions

The standard terms of this SLA may only be varied by the Special Conditions contained in Schedule 1.

## Definitions

As used herein, the following terms have the following meanings:

"Baseline Structure" means the content and application configuration to which a Service is to be restored in the event of a failure of the service.

"Business Hours" at a particular IBC means 8:00 am to 5:00 pm, Monday through Friday, excluding public holidays in the city where the IBC is located.

"Change Request" means a request for the establishment of a new service or a change to an existing service.

"Customer Authorized Representative" is defined in Section 2.

**"Customer Contact"** means the person designated by Customer as the person responsible for tracking Problems (usually the person who logs the problem).

**"Disaster"** means a Problem that constitutes an environmental disaster at any of Interpath's data centers as notified by Interpath to Customer and includes both physical (e.g., storm, war, flood, fire) and an electrical disasters and is a Force Majeure Event for the purposes of the Master Agreement.

"Downtime" is an Outage for which a Rebate is payable and includes:

- Outages for which Interpath is responsible in excess of Service Availability; and
- Outages for periods in excess of planned periods for Service Restoration

but does not include:

- the planned periods of Scheduled Outages; and
- Outages not caused by, or within the reasonable control of, Interpath.

"Downtime Rebate" is a Rebate for annual Downtime.

"Outage" is the time during which a Service is unavailable for productive use by Users and can be expressed as a percentage or as period of time.

"Non-Standard Problem" means a Problem that is caused by an event that is outside Interpath's control or an event that is within Interpath's control but is unusual and catastrophic in nature and consequently difficult to resolve. Non-Standard Problems may include, but are not limited to, carrier failures, cable disruptions, software restriction or failures, denial of service attacks, and a catastrophic failure of Interpath's internal network.

**"Problem"** means an issue or a fault that either party has identified or caused and which affects the continuous availability or a sporadic or intermittent problem which affects system availability or performance of the Services and is either a Standard Problem or a Non-Standard Problem.

"Problem Support" means the support service Interpath will provide to Customer in relation to Problems on a day to day basis as set out below.

"Provider Planned Outage" means those outages that occur on non-Interpath networks or services such as, but not necessarily limited to, maintenance activities by carriers, banks and/or credit card clearing houses, or on specialized data feeds.

"Rebate" is the amount rebatable to Customer pursuant to Section 9.

"Satisfactory User Sessions" means the performance criteria that Interpath will use its best efforts to provide a typical User from the Customer system, to the level of Service Availability.

"Scheduled Outage" means an Outage planned by Interpath or any of its third party providers that interrupts the continuous availability or performance of the Services.

**"Service Restoration"** means restoration of the Services to the state where the Baseline Structure has been re-established (if applicable) and is delivering Service Availability to Users.

**"Standard Problem"** means a Problem for which the remedy is reasonably within Interpath's control.

**"Technical Support"** means the support service Interpath will provide to Customer on a day to day basis as set out in Section 4 other than Problem Support.

"Technical Support Request" means a request for Technical Support.

"Third Party Rebate" means a pro-rata portion of the amount of any rebate received by Interpath from any of its third party Providers as a result of that Provider being responsible for an event that caused an Outage, as determined by Interpath in its absolute discretion.

"User" in relation to Interpath's web hosting services, means a person who seeks access to the Customer web site over the Internet.

Definitions specific for this SLA denoted in Table 13.1 below:

TABLE 13.1

| Terms | Definitions |
|-------|-------------|
| #24 | #25 |
| #24 | #25 |

#.26  Schedule 1

## SPECIAL CONDITIONS

1.     Customer's Software Specifications. Interpath's services do not include the installation of #27 software. Customer acknowledges that #27 was responsible for installation of the #27 software and is responsible for its maintenance. Interpath's servers have been configured in accordance with #27's specification as set out in Appendix 2 attached hereto. Interpath expressly disclaims any and all warranties regarding the operation of any software or hardware supplied by or in accordance with Customer's specifications or the specifications provided by #27 on behalf of Customer.

*Appendix 1*

EVENT NOTIFICATION FORM

*(See section 2)*

### *#28 Appendix 2*

Customer'S SPECIFICATIONS

(Specifications provided by Customer or by #27 on behalf of Customer)

*(See also Special Condition 1)*

Schedule F

# PREFERRED ASP PARTNER REGISTRATION TO MASTER ESCROW AGREEMENT



WHEREAS the Preferred ASP Partner has duly licensed the Products and wishes rights under the Master Source Code Escrow Agreement dated April 1, 2000, between Pivotal Corporation and Fort Knox Escrow Services, Inc., attached (the "Pivotal Escrow Agreement"), and in accordance with the conditions below (collectively, the "Escrow Conditions").

Interpretation.
The Escrow Conditions shall be interpreted in accordance with the Pivotal Preferred ASP Partner Agreement ("**Partner Agreement**"), and with the terms and conditions of the Pivotal Escrow Agreement, attached. In the event of an inconsistency the terms and conditions of this Master Escrow Agreement shall take precedence.

Scope.
Pivotal hereby grants software escrow rights to the Preferred ASP Partner, and the Preferred ASP Partner agrees to pay for such escrow rights, in accordance with these Escrow Conditions.

| Interpath Communications, Inc. | 1700 Perimeter Park Drive Morrisville, NC 27560 | Tel: (919) 253-6000 Fax: (919) 253-6565 www.interpath.net |
|---|---|---|
| (the "Preferred ASP Partner") | | |
| Primary Contact: | Graham Perry •(919) 253-6006 | • |

Term.
The term of these Escrow Conditions and the Pivotal Escrow Agreement will commence as of the Effective Date, subject to Pivotal's submission to Fort Knox of the Preferred ASP Partner's most current License Certificate, attached to the Escrow Agreement as Exhibit C together with this completed Exhibit F and delivery to Pivotal for acknowledgment by the Escrow Agent, which Pivotal shall complete within 30 days of the Effective Date. The term of the Escrow Conditions and the Pivotal Escrow Agreement will continue for so long as, (a) the Preferred ASP Partner's rights to license the Products remain in full force and effect, and (b) the Preferred ASP Partner has maintained its escrow rights hereunder by full and current payment of the Escrow Fees as defined below.

Payment.
The Preferred ASP Partner shall pay Pivotal for the escrow rights hereunder, the amount of one-thousand United States dollars ($1,000.00) (the "**Escrow Fees**") for each twelve-month period of escrow rights, prior to the Effective Date and each anniversary date for each subsequent annual renewal period. The Escrow Fees do not include taxes in the nature of withholding, goods and services, sales and use, customs or like taxes and dues, which shall be the responsibility of the Preferred ASP Partner. The Escrow Fees are strictly for the Source Code and in accordance with the standard conditions of the Pivotal Escrow Agreement attached hereto. The Escrow Fees shall be subject to a reasonable annual adjustment by Pivotal, on reasonable notice, only upon appropriate documentation that Fort Knox Escrow Services Inc. has increased its fees to Pivotal for such Pivotal Escrow Agreement.

Representations of Pivotal to Preferred ASP Partner.

Pivotal represents and warrants to Preferred ASP Partner, at all times during this Agreement, that (i) subject to subsection (iii) below, the source code on deposit with the Pivotal Escrow Agent constitutes all current source code and documentation for Pivotal owned Products licensed to Preferred ASP Partner pursuant to the License Agreement ("Source Code"); (ii) the Source Code delivered to the Escrow Agent is in a form suitable for reproduction by computer and/or photocopy equipment, and consists of a full source language statement of the program or programs comprising Pivotal owned Products and complete program maintenance documentation, including all flow charts, schematics and annotations which comprise the precoding detailed design specifications, and all other material necessary to allow a reasonably skilled third party programmer or analyst with knowledge of the languages used in the Source Code to maintain or enhance the Source Code without the help of any other person or reference to any other material; and (iii) Pivotal will supplement the Source Code delivered hereunder promptly with all revisions, corrections, enhancements or other changes so that the Source Code constitutes a human-readable program for the current release of the Products and provide Preferred ASP Partner of the transmittal letter of such supplement (such supplements to occur no less than annually or more often as revisions to the Products are generally delivered by Pivotal).

Interpath Preferred ASP Partner Agreement 0601

IN WITNESS WHEREOF the parties have entered into this Agreement on the Effective Date set out below. This Agreement is non-binding until executed by all parties. IN ANY EVENT, IF THIS AGREEMENT IS CHANGED IN ANY MANNER, WITHOUT PIVOTAL'S WRITTEN ACCEPTANCE, IT SHALL BE DEEMED NULL AND VOID.

INTERPATH COMMUNICATIONS, INC

_____
Authorized Signature

G. Perry . EVP Business Development
Name and title

June 29. 2001 ____ ____ _____
Effective Date


PIVOTAL CORPORATION

_____
Authorized Signature

A. Beaulieu, General Counsel
Name and title


INTERPATH COMMUNICATIONS, INC.

_____
Authorized Signature

Louis Selamone Jr.     Executive Vice President, Finance &
Name and Title                    Administration & CFO

Schedule G

# PIVOTAL PREMIER GLOBAL TECHNICAL SERVICES PROGRAM FOR PARTNERS



The Pivotal Premier Global Technical Services Program for Partners covers the standard support and maintenance to be provided by Pivotal pursuant to the Pivotal Preferred ASP Partner Agreement with Partner effective June 29, 2001 (the "Agreement"). The support provided to the Partner will include all services and conditions set out in Section 9 of the Agreement. Given the dynamic nature of the Pivotal eRelationship/eSelling System and unique support services provided, it is necessary for both Pivotal and the Partner to work together at all times to ensure optimal performance of the Pivotal eRelationship/eSelling System for the Partner. The specific details of the Pivotal Premier Global Technical Support Program for Partner and respective obligations of both Pivotal and the Partner are set out below.

The Pivotal Premier Global Technical Services Program is reviewed and renewed on a yearly basis. The first year of Support and Maintenance under the Program is effective from the time the first eRelationship/eSelling System is operating in production.

## Key Features of Pivotal Premier Global Technical Services for Partners

- Incident support via telephone, email, and web site.

- Partners may designate the required number of named support coordinators who may contact Pivotal for support during support availability

- Pivotal Premier Partners receive the highest priority support from Pivotal and immediate assignment of support incidents directly to Pivotal Master Support Specialists.

- Guaranteed Response Times and Escalation Procedures through Pivotal Master Support Specialists.

- Updates and upgrades for all licensed and supported Pivotal products. When possible, advance notification of upcoming System updates and upgrades.

- Product Documentation.

- Business Module support, regardless of whom has done the customization work for the client. This is based on the assumption that the Business Module and Enterprise Data are provided when requested to Pivotal Master Support Specialists, for which information is confidentially maintained.

- Global, multi-language support capability.

- Yearly remote eRelationship or eSelling System audit and recommendations report, upon request. Travel expenses for on-site requests will be at the expense of the client.

- Access to Pivotal's Knowledge Base through Pivotal's confidential CustomerHub/AllianceHub web site.

- Support for all licensed and supported Pivotal products.

## Unlimited Partner Access to Support Services

The Partner's named support coordinators have unlimited access to request and receive telephone incident support services from Pivotal for the Software. Incident support is included in the flat rate for this program. However, there are certain instances where the Partner may be required to pay for professional services rendered.

## Premier Global Technical Services Availability

- Direct telephone support from Sunday 18:00 – Saturday 06:00 GMT, with the exception of December 25th and January 1st.

- After hours priority support access 24 hours per day, seven days per week for critical and serious support incidents. Please see severity ratings for further information regarding critical and serious support classifications.

## Submitting Incidents

Via Telephone:

| | |
|---|---|
| North America | 800 7716244 |
| Australia | 1 900 148 142 |
| Belgium | 0800 78206 |
| Denmark | 80 88 03 57 |
| Eire | 1800 509 150 |
| France | 0800 916173 |
| Germany | 0800 182 5231 |
| Japan | 0053116 0155 |
| Luxembourg | 800 2 9601 |
| Netherlands | 0800 023 2585 |
| New Zealand | 0800 441727 |
| Sweden | 020 790574 |
| United Kingdom | 0800 085 0066 |
| After Hours Emergency Pager | 800 492-6015 |

Via Email:

support@pivotal.com

Via Web:

http://customerhub.pivotal.com

When reporting incidents to Pivotal, the Partner must reasonably explain its difficulty in sufficient detail so as to enable Pivotal to fully understand, reproduce and diagnose the problem or difficulty, including revision level information, problem documentation and any media containing data. The Partner should also, wherever possible, assign a Severity Level to the problem or difficulty in accordance with the table listed below.

Each incident reported to Pivotal should be properly defined to ensure optimal response time. An incident is defined as a single support issue that cannot be broken down into subordinate problems. Documentation errors and product "wishes" or feature enhancements are not proper support incidents for the purposes of this program and will be handled in accordance with the general terms of the Agreement.

## Remote Support Services

- It is recommended that Pivotal and the Support Specialists be able to dial into client systems as needed for on-line debugging and have access to the Partner's Business Module and sample Enterprise Data.
- If agreed, Pivotal and the Partner must assign appropriate resources to assist in remote dial-in.
- Information is gathered on a "need to know" basis only and is maintained as confidential.

## Joint Responsibilities

Pivotal will:

- Use reasonable commercial efforts to resolve all incidents that the Partner submits.
- Document each incident and its resolution.
- Track the time an incident remains open and escalate when needed, as set out below.
- Confirm with the Partner that the incident is resolved.

Partner will:

- Ensure that all named support coordinators attend relevant Pivotal certified training courses and are adequately trained in all aspects of the Pivotal eRelationship/eSelling System.
- Promptly record and submit all incidents through trained support coordinators.

Interpath Preferred A2P Partner Agreement 0601

- Assign appropriate Severity Rating to the incident, in accordance with the table set out below.
- Perform problem determination and diagnostic activities suggested by Pivotal promptly and completely.
- Perform problem resolution activities as suggested by Pivotal.

## Severity Ratings and Response Time

The table below defines Severity Levels from A through E and indicates the expected response time based on the Severity Level. Expected response time is based on a Global average for all Support Incidents by severity. The Partner will assist in setting Severity Level classification with Pivotal Global Technical Services team members.

Response Time is defined as the lapse of time between when a call has been received by Pivotal's Global Technical Support team during the hours specified above and when the designated support contact has responded with an action plan to set expectations. Whenever possible the action plan will include estimates on time to problem isolation, time to workaround or time to resolution.

## Incident Severity Levels

| Severity Level | Definition | First Response |
|---|---|---|
| A – Critical | Production down.<br><br>Business outage or significant impact that threatens current productivity, data corruption, server crash or hang. | Within 30 Minutes |
| B – Serious | Development down or production impacted but not down.<br><br>High-impact problem where production is proceeding, but in a significantly impaired fashion and there are time sensitive issues important to current or future productivity. | Within 1 Hour |
| C- Important | Important problem that does not have significant current productivity impact | Within 4 Hours |
| D – Minor | Minor problem that does not have impact on current productivity | Within 8 Hours |
| E – Monitor | Issues requiring no further action beyond monitoring for follow-up if needed | Within 12 Hours |

## Incident Escalation

- The Partner must be prepared to create an Impact Statement in order to escalate the incident.
- When a satisfactory resolution to a Partner incident cannot be achieved within a mutually satisfactory time frame, Pivotal will follow the Incident Escalation Process set out below.
- Escalation within Pivotal has to be matched by similar escalation with the Partner organization.
- Pivotal Global Technical Support controls the escalation process, but the Partner named support coordinator(s) must be involved at every stage.
- In some cases escalation might lead to "quick fix engineering" as outlined in the Maintenance Service section of the Agreement.

## Incident Escalation Process

All critical and serious incidents unable to be handled by client's primary Support Engineer representative will be promptly escalated to Pivotal's Global Technical Services Manager. All commercially reasonable attempts will be made to remedy the problem through fixes or workaround in a timely manner having regard to the Severity Level of the problem. Should second level support be unsuccessful, the problems will be escalated to the Engineering Department for the Software.

Interpath Preferred ASP Partner Agreement 0601

If, in the opinion of either party, the other party has failed to comply with the relevant provisions of this Agreement or to perform its obligations in a satisfactory manner, then the following escalation procedure may be invoked by either party. In order to expedite the prompt resolution of any disputes which may arise, both parties agree that this escalation procedure will be employed prior to either party availing itself of legal remedies against the other party. However, neither party shall be precluded from seeking injunctive relief against the other party at any time.

The aggrieved party shall provide the other with written notice of intent to invoke the escalation procedure, and the dispute will be immediately referred to the initial Level Representative, as described below.

In the event a dispute has not been resolved at the Initial Level, or a corrective plan of action mutually agreed upon, within ten (10) calendar days after referral of the dispute to the Initial Level Representative, the dispute will be automatically escalated to the Second Level Representative, as described below.

In the event a dispute has not been resolved at the Second Level, or a corrective plan of action mutually agreed upon, within ten (10) calendar days after escalation of the dispute from the Initial Level Representative, the dispute will be automatically escalated to the Third Level Representative, as described below.

In the event a dispute has not been resolved at the Third Level, or a corrective plan of action mutually agreed upon, within ten (10) calendar days after escalation of the dispute from the Second Level, then either party may pursue any remedy otherwise available to it under law or the Agreement.

The designated representatives of the parties for each level shall be as set forth below:

| Levels of Escalation | Pivotal | Partner |
|---|---|---|
| Initial Level | Team Lead, Support Specialists | Support Coordinator |
| Second Level | Senior Manager, Global Support Services | |
| Third Level | Senior Director, Global Technical Services | · |

IN WITNESS WHEREOF the parties have entered into this Premier Global Technical Services Program for Partners Agreement on the 29th day of June, 2001. This Agreement is non-binding until executed by all parties. IN ANY EVENT, IF THIS AGREEMENT IS CHANGED IN ANY MANNER, WITHOUT PIVOTAL'S WRITTEN ACCEPTANCE, IT SHALL BE DEEMED NULL AND VOID.

INTERPATH COMMUNICATIONS, INC.

_____
Authorized Signatory

G. Perry EVP Business Development
Name and Title

June 29, 2001
Effective Date

INTERPATH COMMUNICATIONS, INC.

_____
Authorized Signatory

Louis Salamone Jr. , Executive Vice President Finance & Administration & CFO
Name and Title

PIVOTAL CORPORATION

_____
Authorized Signatory

A. Beaulieu, General Counsel
Name and Title





INTERPATH
5150 McCrimmon Parkway
Suite 419
Morrisville, North Carolina 27709-3961
(919) 253-6000

June 13, 2002
Via FEDEX and Facsimile

A. Beaulieu
General Counsel
Pivotal Corporation
10210 N.E. Points Drive
Kirkland, WA 98033

Re: Notice of Intent to Terminate the June 29, 2001 Pivotal Preferred ASP Partner Agreement

Dear A. Beaulieu:

I am writing to give you notice that Interpath Communications, Inc. ("Interpath") will terminate the June 29, 2001 Pivotal Preferred ASP Partner Agreement between Pivotal Corporation ("Pivotal") and Interpath (the "Agreement"). Specifically, under section 8.5 of the Agreement, Interpath will terminate the Agreement on June 23, 2002, due to Pivotal's failure to meet the Revenue Targets in section 3 of Schedule A of the Agreement.

Furthermore, Pivotal is in material breach under section 8.4 of the Agreement for its failure to provide Interpath with Products which perform substantially in accordance with the Documentation.

On account of Pivotal's failure to meet the Revenue Targets and material breach of the Agreement, Interpath demands return of its $2,150,000 License and Maintenance Fees paid to Pivotal under the Agreement. Additionally, under section 8.4 of the Agreement, Interpath further demands that Pivotal pay Interpath the remaining Minimum Obligation payment of $7,080,000.

Should Pivotal not make payment to Interpath of $9,230,000 on or before July 23, 2002, Interpath shall pursue its legal remedies.

Sincerely,

Louis Salamone Sr.
Executive Vice President and CFO

Page 1 of 1

EXHIBIT B